IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Penn Engineering & Manufacturing Corp., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No.: _____ |
| | : | |
| | : | |
| Pemco Hardware, Inc., Dongguan Fenggang Pemco Hardware Factory, and Shenzhen Pemco Fastening Systems Co., Ltd., | : | |
| | : | |
| Defendants. | : | |

**Plaintiff's Memorandum Of Law In
Support Of Motion For Preliminary Injunction**

Plaintiff, Penn Engineering & Manufacturing Corporation, respectfully submits this

memorandum of law in support of its Motion for Preliminary Injunction pursuant to Fed.R.Civ.P.

65 and 15 U.S.C. § 1116.

**TABLE OF CONTENTS**

                                                                    Page No.

TABLE OF AUTHORITIES…………………………………………….................    iv

I.      INTRODUCTION…………………………………………………….    1

II.     STATEMENT OF FACTS…………………………………………….    1

        A.      Background of Plaintiff PennEngineering & Manufacturing
                Corporation………………………………………………...............    1

        B.      PennEngineering's Extensive Product Line…………….........................    2

        C.      PennEngineering's Superior Product Quality………………………….    6

        D.      PennEngineering's Famous PEM Family of Marks…………………….    8

        E.      PennEngineering's Additional Famous Marks………………………….    11

        F.      Advertising, Marketing and Promotion of PennEngineering's Marks….    12

        G.      Defendants' Trademark Infringement…………………………………    15

        H.      Defendants' Patent Infringement……………………………………..    18

III.    THE LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF IN
        TRADEMARK CASES…………………………………………………….    18

        A.      PennEngineering is Likely to Succeed on the Merits of its Counts For
                Federal Statutory Trademark Infringement and False Designations Of
                Origin, and Common Law Trademark Infringement…………………….    19

                1.      PennEngineering's Incontestable Registrations are Prima Facie
                        Evidence of PennEngineering's Ownership and Exclusive Right
                        To Use the Marks in Connection with Fastener Products ………    20

                2.      PennEngineering's Other Registrations Are Prima Facie Evidence
                        of PennEngineering's Ownership and Exclusive Right to Use the
                        Marks in Connection With Fastener Products……………………    22

                3.      PennEngineering Has Established Ownership and the Exclusive
                        Right To Use the PEM Family of Marks in Connection with
                        Fastener Products…………………………………………………    22

4.      Defendants' Use of the PEMCO Infringing Marks Creates
        Confusion As to the Source or Sponsorship of Its Fastening
        Products ……………………………………………………..   24

        a.      Factor 1- Similarity of the arks……………………………   25

        b.      Factor 2- The Mark PEM and the Pem Family of Marks
                Are Strong And Entitled to Broad Protection Since They
                Are Inherently Distinctive………………………………   31

        c.      Factor 3- PennEngineering's Fastening Products Are
                Inexpensive and Purchasers are Not Likely to Carefully
                Investigate the Source of Such Goods…………………   33

        d.      Factor 4- Defendants' Use of the Infringing Marks
                Began Only Recently…………………………………   34

        e.      Factor 5- Defendants Intend to Divert Business from
                PennEngineering ………………………………………..   34

        f.      Factor 6- PennEngineering Can Establish Initial Interest
                Confusion…………………………………………………..   35

        g.      Factors 7 & 8- PennEngineering and Defendants Market
                Their Goods Through the Same Trade Channels and
                Target the Exact Same Customers………………………   36

        h.      Non-exclusive Factors Which Lead to the Conclusion
                That Defendants' Acts Create a Likelihood of Confusion   37

B.      PennEngineering Will Suffer Irreparable Harm Unless Defendants'
        Infringement is Enjoined……………………………………….   38

C.      The Balancing of Equities Favors Injunctive Relief Where Defendant
        Is Infringing PennEngineering's Trademark……………………   39

        1.      Defendants Intentionally Adopted Marks That Are Confusingly
                Similar to PennEngineering's Marks……………………   40

        2.      PenEngineering Seeks Only Limited Equitable Relief…………   41

        3.      Potential Injury to Defendant is Subservient to Protection of the
                Public Interest and the Trademark Rights of PennEngineering…   41

D.      Public Interest Favors Issuance of an Injunction to Enjoin Defendants'
        Use of the Infringing Marks…………………………………….   42

IV.    THE LEGAL STANDARD FOR ISSUING INJUNCTIONS IN
PATENT CASES……………………………………………………………  42

V.    ARGUMENT…………………………………………………………………..  43

    A.    PennEngineering Will Likely Succeed on the Merits……………………  43

        1.    PennEngineering's Patents Are Presumed Valid and Defendants
Will Not Be Able to Present Evidence to Substantially
Question Validity………………………………………………  44

        2.    PennEngineering Can Demonstrate a Strong Case for
Infringement of the '381 Patent………………………………..  45

        3.    PennEngineering Can Demonstrate a Strong Case for
Infringement of the '899 Patent………………………………..  46

        4.    PennEngineering Can Demonstrate a Strong Case for
Infringement of the '705 Patent………………………………..  47

        5.    PennEngineering Can Demonstrate a Strong Case for
Infringement of the '501 Patent………………………………..  48

        6.    PennEngineering Can Demonstrate a Strong Case for
Infringement of the '321 Patent………………………………..  48

    B.    PennEngineering Will Be Irreparably Harmed by Defendants' Continued
Infringement…………………………………………....................................  49

        1.    Irreparable Harm Should Be Presumed Since Both Parties
Practice the Patented Technology………………………………  49

        2.    Without Preliminary Injunctive Relief, PennEngineering Will
Lose Valuable Market Share and Business Relationships………  51

        3.    Defendants May Not Be Able to Compensate PennEngineering
For Its Lost Profits……………………………………………..  52

    C.    The Balance of Hardships Supports Granting PennEngineering's
Motion…………………………………………………………………  53

    D.    The Public Interest Dictates the Issuance of an Injunction………………  54

VI.    CONCLUSION……………………………………………………………..  55

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page No.**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000)………………………………………… 19, 24, 25, 30, 31, 35

*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008)…………………………………………………….  50

*American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
    42 F.3d 1421 (3d Cir.1994)……………………………………………………………  42

*American Standard Inc. v. Scott & Fetzer Co.*,
    200 U.S.P.Q. 457 (T.T.A.B. 1978)………………………………………………  23

*AMF, Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979………………………………………………………  35

*Apple Computer, Inc. v. Franklin Computer Corp.*,
    714 F.2d 1240 (3d Cir. 1983……………………………………………………..  41

*Atlas Powder Co. v. Ireco Inc.*,
    773 F.2d 1230 (Fed. Cir. 1985)……………………………………………………  50

*Aventis v. Barr Labs., Inc.*,
    208 F.3d 842 (Fed. Cir. 2006)……………………………………………………  43

*Bausch & Lomb, Inc. v. Barnes-Hind Hydrocurve, Inc.*
    796 F.2d 443 (Fed. Cir. 1986)……………………………………………………  45

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*,
    2006 WL 3446144 (N.D. Ill. Nov. 29, 2006)…………………………………….  52

*Blumenfeld Development Corp. v. Carnival Cruise Lines, Inc.*,
669 F.Supp. 1297 (E.D. Pa. 1987)…………………………………… 20, 25, 40, 41

*Bosch v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011)…………………………………………………..  50

*Brooktree Corp. v. Advance Micro Devices, Inc.*,
    977 F.2d 1555 (Fed. Cir. 1992)……………………………………………………  44

*Canon Comp. Sys., Inc. v. Nu-Kote Int'l, Inc.*,
    134 F.3d 1085 (Fed. Cir. 1998)…………………………………………………..  51

*Checkpoint Sys. v. Check Point Software Techs., Inc.*,
269 F.3d 270 (3d Cir. 2001)……………………………………………… 33, 34, 35, 36

*Chips'n Twigs, Inc. v. Chip-Chip, Ltd.*,
414 F.Supp. 1003 (E.D. Pa. 1976)…………………………………………… 26

*Dominion Bank Shares Corp. v. Devon Holding Company, Inc.*,
690 F.Supp. 338 (E.D. Pa. 1988)………………………………………….. 30

*eBay, Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)……………………………………………… 38, 43, 49, 50

*Eisai Co., Ltd. v. Teva Pharm.USA, Inc.*
Civ. A. No. 05-5727, 2008 WL 1722098 at *10 (D.N.J. March 28, 2008)………. 50

*E.I. du Pont de Nemours & Co. v. Mac Dermid, Inc.*,
2007 WL 2332161 (D.N.J. Aug. 13, 2007)…………………………………… 49

*Ferring Pharms., Inc. v. Watson Pharms., Inc*,
765 F.3d 205 (3rd Cir. 2014)……………………………………………… 19, 38

*First American Marketing Corp. v. Canella*,
2004 WL 250537 (E.D.Pa. 2004)………………………...………………… 19, 30

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*,
30 F.3d 466 (3d Cir. 1994)……………………………………… 20, 31, 34

*Ford Motor Co. v. Summit Motor Prod., Inc.*,
930 F. 2d 277 (3d Cir. 1991)………………………………………………. 34

*Garvey Corp. v. Barry Wehmiller Desing Group, Inc.*,
365 F.Supp.2d 893 (N.D. Ill. 2005)………………………………………… 51

*The Gideons Int'l, Inc. v. Gideon 300 Ministries, Inc.*,
94 F.Supp.2d 566 (E.D.Pa. 1999)………………………...……………… 19

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
774F.3d 192 (3rd Cir. 2014)……………………………………………… 38

*H.H. Robertson Co. v. United Steel Deck, Inc.*,
820 F.2d 384 (Fed. Cir. 1987)……………………………………… 44, 50, 53

*Horizon Financial, FA. v. Horizon Bancorp.*,
2 U.S.P.Q.2d 1696 (E.D. Pa. 1987)………………………………… 25, 39, 42

*Hybritech, Inc. v. Abbott Labs.*,
4 U.S.P.Q. 2d 1001 (C.D. Cal. 1987)……………………………………… 51

*Hybritech, Inc. v. Abbott Labs.*,
    849 F.2d 1446 (Fed. Cir. 1988)…………………………………………… 43, 50, 51, 54

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.*,
    802 F.2d 1367 (Fed. Cir. 1986)…………………………………………... 44

*Interactive Gift Express, Inc. v. Compuserve, Inc.*
    256 F.3d 1323 (Fed. Cir. 2001)…………………………………………… 43

*Interpace Corp. v. Lapp, Inc.*,
    721 F.2d 460 (3d Cir. 1983)……………………………………………… 25, 30, 31

*J & J Snack Foods Corp. v. McDonald's Corp.*,
    932 F.2d 1463 (Fed. Cir. 1991)…………………………………………… 23

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
    369 F.2d 700 (3d Cir. 2004)……………………..……… 19, 24, 25, 33, 34, 36, 40, 42

*Larami Corp. v. Lanard Toys, Ltd.*,
    1992 WL 13683, at *1 (E.D. Pa. Jan. 24, 1992)………………………………… 44

*Lettuce Entertain You Enter., Inc. v. Leila Sophia AR, LLC*,
    703 F.Supp.2d 777 (N.D. Ill. 2010)………………………………………….. 28

*Marion Labs. v. Buiochemicals/Diagnostics*,
    6 USPQ 2d 1215 (T.T.A.B. 1988)………………………………………… 23

*Mobil Oil Corp. v. Teagarden*,
    190 USPQ 590 (T.T.A.B. 1976)………………………………………….. 28

*Norbrook Labs Ltd. v. G.C. Hanford Mfg., Co.*,
    126 Fed. Appx. 507 (2d Cir. 2005)………………………………………… 51

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
    290 F.3d 578 (3d Cir. 2002)………………………………………………….. 40

*Oakley, Inc. v. Sunglasses Hut Intern.*,
    316 F.3d 1331 (Fed. Cir. 2003)………………………..................................... 43

*Opticians Assoc. of Am. v. Indep. Opticians of Am.*,
    920 F.2d 187 (3d Cir.1990)…………………………..… 19, 20, 25, 30, 38, 39, 40, 42

*Panduit Corp. v. Dennison Mfg. Co.*,
    810 F.2d 1561 (Fed. Cir. 1987)…………………………………………….. 44

*Pappan Enter., Inc. v. Hardee's Food Sys., Inc.,*
    143 F.3d 800 (3d Cir.1998)………………………………………………..    40

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
    429 F.3d 1364 (Fed. Cir. 2005)…………………………………………    54

*Primepoint, LLC v. PrimePay, Inc.,*
    545 F.Supp.2d 426 (D.N.J. 2008)……………………………………..    23

*Polymer Techs., Inc. v. Bridwell,*
    103 F.3d 970 (Fed. Cir. 1996)…………………………………………    43, 50, 52

*Purdue Pharma L.P. v. Beehriger Ingelheim GmbH,*
    237 F.3d 1359 (Fed. Cir. 2001)…………………………………………    43

*Quality Inns Int'l Inc. v. McDonald's Corp.,*
    695 F.Supp. 198 (D. Md. 1988)…………………………………………    28, 32

*Reebok Int'l Ltd. v. Baker Inc.,*
    32 F.3d 1552 (Fed. Cir. 1994)…………………………………………    49

*Rubbermaid Commercial Prods., Inc. v. Contico Int'l Inc.,*
    836 F.Supp. 1247 (W.D. Va. 1993)…………………………………………    53

*SK&F Co., v. Premo Pharm. Lab.,*
    625 F.2d 1055 (3d Cir. 1980)……………………………………………..    42

*Sanofi-Synthelabo v. Apolex,*
    470 F.3d 1368 (Fed. Cir. 2006)…………………………………………    45, 51, 54

*Scott Fetzer Co. v. Gehring,*
    288 F.Supp.2d 696 (E.D.Pa. 2003)…………………………………………    19

*S&R Corp. v. Jiffy Lube Int'l, Inc.,*
    968 F.2d 371 (3d Cir. 1992)……………………….…………………..……    19, 38, 40, 42, 43

*Smith Int'l, Inc. v. Hughes Tool Co.*
    718 F.2d 1573, (Fed. Cir. 1983)…………………………………………    43, 44, 49, 54

*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.,*
    279 *F.*3d 1357 (Fed. Cir. 2002)………………………………………….    45

*Tivo, Inc. v. Echostar Comms. Corp.,*
    446 F.Supp.2d 664 (E.D. Tex. 2006)……………………………………………..    51

*Total Containment, Inc. v. Environ Products, Inc.,*
    23 U.S.P.Q. 2d 1305 (E.D. Pa. 1992)…………………………………………    54

*United States Jaycees v. Philadelphia Jaycees,*
    639 F.2d 134 (3d Cir. 1981)………………………….………………….    40, 41

*Victoria's Secret Stores Brand Mgmt, Inc. v. Sexy Hair Concepts, LLC,*
    No. 07-5804, 2009 WL 959775 (S.D.N.Y. Apr. 8, 2009)……………………    27

*Wayne-Gossard Corp. v. Sondra, Inc.,*
    434 F.Supp. 1340 (D.C. Pa. 1977)…………………………………………..    54

*Windsurfing Int'l, Inc. v. AMF, Inc.,*
    783 F.2d 995 (Fed. Cir. 1986)………………………………………………    54

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008)…………………………………………………………..    43

## Statutes

15 U.S.C. § 1065……………………………………………………………..    21, 31

15 U.S.C. § 1115……………………………………………………………..    21, 31

15 U.S.C. § 1116……………………………………………………………..    19

35 U.S.C. § 282……………………………………………………………..    44, 45

35 U.S.C. § 271……………………………………………………………    45, 46, 47, 48

## Other Authorities

*Callman on Unfair Competition, Trademarks & Monopolies,* §21:10………………………    33

*3 J. McCarthy on Trademarks and Unfair Competition*, §23:6…………….......………..    36

*3 J. McCarthy on Trademarks and Unfair Competition,* §23:61……………………………    28

3A Louis Altman, *Callman on Unfair Competition, Trademarks & Monopolies* § 21:10 …..    33

Trademark Manual of Examining Procedure § 1207.01(b)(iii)(July2015)……………………    29

Trademark Manual of Examining Procedure § 1207.01(d)(xi)(July 2015)………………..    23

## I.      INTRODUCTION

Penn Engineering & Manufacturing Corporation ("PennEngineering") is a well-known, global leader in the industrial fastening solutions industry.  Since its establishment in 1942, PennEngineering has been designing and manufacturing a wide variety of fasteners, fastener components, and fastener installation equipment.  PennEngineering owns more than 150 patents and more than 100 federally-registered trademarks for its products including its famous mark PEM and PEM Family of Marks.  PennEngineering recently discovered that Defendants, direct competitors of PennEngineering, are selling "knock-off" fastener products that infringe 5 of its patents and infringe at least 17 of its trademarks including its famous mark PEM and its PEM Family of Marks.  PennEngineering moves this Court for an Order enjoining such unlawful conduct.  PennEngineering has no adequate remedy at law.

## II.     STATEMENT OF FACTS

### A.      Background of PennEngineering & Manufacturing Corporation

PennEngineering designs and manufactures a wide variety of fasteners, fastener components and fastener installation equipment for diverse industries, including electronics, computer, data/telecom, medical, automotive, marine, aerospace/aircraft, and general manufacturing. Declaration of Leon Attarian ¶2 ("Attarian decl.").  PennEngineering was established in 1942 by K.A. Swanstrom with a revolutionary new fastener product: an easy-to-install, self-clinching fastener that provides load-carrying threads in metal sheets too thin to be tapped. *Id.*  Since then, PennEngineering has grown into a global industry leader. PennEngineering now has about 1,700 employees globally, who make more than 6 billion fasteners a year to generate annual sales in excess of 400 million dollars. *Id*. at ¶11, 15.

### B.      PennEngineering's Extensive Product Line

PennEngineering designs, manufactures and sell a wide variety of fastening products including:

a)      Nuts for sheet metal including the following types: floating, blind, standard, flush, miniature, all metal, locking thread, nylon-insert, locking thread, right angle, installing into stainless, spinning flare, and hard panel nuts;

b)      Studs and pins for sheet metal including the following types: concealed head, flush head, flush-head low-displacement, heavy duty non-flush, hard-panel stud; high-tensile-strength non-flush; thin-sheet non flush; unthreaded pins flush; installing-into-stainless; self-clinching; swaging collar studs non-flush;

c)      Standoffs for sheet metal including the following types; concealed-head; blind threaded; thru-hole threaded and unthreaded; for installing into stainless; thin-sheet thru-hole standoffs; grounding; close-to-edge; self-clinching; thin-sheet thru-hole standoffs for installation into stainless steel;

d)      Captive panel screws and hardware including the following types: captive screws surface mount; for installing into stainless; heat sink mounting fastener system; large-knob, spring-loaded; locating pin, spring-loaded; low profile knob, spring-loaded; screw head, spring-loaded; screw head, no spring; surface mount, spring-loaded captive panel screw; tool only, non flush, spring-loaded; tool only, flush mounted, no spring; tool only, spinning clinch bolt, no spring; tool only, spinning clinch bolt, with spring;

e)      Sheet-to-sheet attachment including the following types: metal to metal; metal to metal hinging with washer; metal to plastic; panel to panel; metal to metal, for installing into stainless; self-clinching;

f)      Cable tie-mounts and hooks for sheet metal including the following types: standard tie-mount; and hook style tie-mount;

g)      Fasteners for mounting into printed circuit boards including the following types: captive screws, broaching; captive screws, surface mount; captive screws, other; nuts, broaching; nuts and spacers/standoffs, surface mount; nuts, right angle; standoffs, broaching; standoffs, flare mount; studs, broaching; surface mount, spring-loaded captive panel screw; tin plated brass nuts and spacers/standoffs, surface mount;

h)      Miniature (micro-sized) fasteners including the following types: self-clinching pins; self-clinching standoffs; self-clinching tack pins; surface mount nuts/standoffs; thru-threaded inserts for plastic; and,

i)      Weld nuts.

2

Attarian decl. ¶3.

Since first inventing a novel clinch fastener in 1943, PennEngineering has steadily expanded the type and variety of products in its portfolio.  For example, in or around 1967, PennEngineering expanded its business into designing, manufacturing and selling a wide variety of fastener installation equipment including the following types: pneumatic and hand presses; die feed systems; installation equipment accessories including coalescing filters, turret tool systems, sheet metal joining system; and robot cell devices. Attarian decl. ¶4.  In or around 1986, PennEngineering acquired Standard Insert Co. and expanded its metal inserts for plastics product line to include molded in, press in, and post molded varieties. Attarian decl. ¶5.  In or around 2000, PennEngineering acquired Atlas Engineering and added a blind threaded rivet and metal insert product line including the following: low profile head; minimized profile head; half-hex shank, low profile head; thin wall, low profile head; blind threaded studs; 360° swaging low profile head as well as installation tooling. Attarian decl. ¶6.

In or around 2005, PennEngineering acquired MRC China, now called PennEngineering Automotive Fasteners, and expanded its product line for the automotive fastener industry including the following:

  a)   Externally threaded fasteners including the following types: banjo bolts; double ended studs; hex bolts; hex flange bolts; screws; shoulder bolts; square head bolts;

  b)   Internally threaded fasteners including the following types: floating nuts; hex flange nuts / hex nuts; insert nuts; inserts for plastics; lock nuts; pierce nuts on wire; tube nuts / weld nuts;

  c)   Other fasteners & hardware including the following types: brake & fluid handling components; hollow dowel pins / dowel pins; locator / guide pins; ball studs / bushings; compression limiters; double ended rivets; grooved shafts; hinge pins / sleeves; rivets / shoulder rivets;

   d)   Self-clinching fasteners including the following types: heavy duty, high torque and high tensile externally threaded studs; internally threaded clinch and weld nuts; internally

3

threaded spacers and standoffs; captive screws; micro fasteners.  These fasteners are typically used in the following applications: airbag housing / mirror housing; battery covers; brackets / door trim; grill assembly; sunroofs; automotive electronics; and,

      e)     Blind threaded rivet nuts including the following types: standard duty; heavy duty; high torque.  These fasteners are typically used in the following applications: bumper and frame systems; ev battery trays; fuse boxes; mounting to hydroformed tubing; radiators; sunroofs; tool box.

Attarian decl. ¶7.

In 2001, PennEngineering acquired Precision Steel Holdings Limited of Galway, Ireland, a manufacturer of turned screw machine parts. Attarian decl. ¶13.  The company now trades as PennEngineering Fastening Technologies (Europe) Ltd. *Id.*  This 110,000 square foot facility supplies screw machined, headed and formed products to a number of European authorized distributors. *Id.*

In 2013, PennEngineering created pennTool Group, which specializes in the design and manufacture of precision tooling for heading and screw machine operations. Attarian decl. ¶14. In 2014, PennEngineering acquired PROFIL VerbindugstechnikV®, which specializes in the design and manufacture of pierce nuts and studs which are fastened to metal-shaped parts by means of a riveting process.  PROFIL also constructs automated feeding equipment which is customized to meet the individual production requirements of its customers. *Id.*

Over the years, PennEngineering has expanded its inserts-for-plastics product line including the following:

      a)     Ultrasonic/heat staking inserts including the following types: tapered, thru threaded; straight wall thru threaded; symmetrical, thru threaded;

      b)     Molded-in inserts including the following types: blind threaded; self-locking blind threaded; thru threaded; knurled spacers; and,

      c)     Press-in inserts including the following types: hexagonal; thru threaded; flange-head; straight knurl.

Attarian decl. ¶8.

Over the years, PennEngineering has expanded its product line of nuts and studs that are fastened to metal parts or panels by means of a riveting, piercing or pressing process including the following types: rivet nuts/studs; pierce nuts/studs; press in nuts/studs; manual, automatic feed and robotic installation systems. Attarian decl. ¶9.  True and correct copies of sample pages from PennEngineering's current products catalogue are shown in exhibit 1. Attarian decl. ¶10. All of these products are advertised, promoted and sold using one or more of PennEngineering's numerous trademarks and most are advertised, promoted and sold using the PEM Family of Marks (defined *infra*). *Id.*

Since 1942, PennEngineering has steadily grown its engineering and production capacity. PennEngineering now has manufacturing and technical facilities in the United States, Europe, and Asia including Danboro, Pennsylvania; Winston-Salem, North Carolina; Galway, Ireland; Friedrichsdorf, Germany and Kunshan, China. Attarian decl. ¶11.  Over the past 73 years, PennEngineering has manufactured and sold billions of fastener products. *Id.*  For example, in 2015 alone, PennEngineering will manufacture and sell over *six billion* fasteners. *Id.*

In addition to the United States, PennEngineering's products are sold in more than 75 countries through an extensive network of engineering representatives and distributors in, for example, Australia, Austria, Brazil, Canada, China, Denmark, France, Finland, Germany, Hong Kong, India, Ireland, Israel, Italy, Japan, South Korea, Mexico, New Zealand, Norway, Portugal, Singapore, Spain, South Africa, Sweden, Switzerland, Taiwan, United Kingdom and the United States. Attarian decl. ¶12.

Since 1942, PennEngineering has continuously invented new fastener products and improved on old fastener products as evidence by its extensive patent portfolio. Attarian decl. ¶16.  PennEngineering spends more than $1,200,000 per year to design, develop, test and certify its new fastener products. *Id.*  PennEngineering has been issued[1] more than 150 U.S. and foreign patents for its fastener products, fastener installation equipment, and methods of manufacturing. *Id.*  A true and correct list of PennEngineering's *active* U.S. and foreign patents is shown in exhibit 2. *Id.*

### C.       PennEngineering's Superior Product Quality

Over the past 73 years, PennEngineering has developed a reputation for designing, manufacturing and selling only the highest quality fastener products. Attarian decl. ¶17. PennEngineering exercises extensive quality control at its manufacturing plants and has a manufacturing strategy of defect prevention rather than defect detection. *Id.*  PennEngineering uses statistical tools throughout its manufacturing processes to monitor the performance and to assure effective quality control of each process step. *Id.*  If a non-conforming situation arises, it is resolved immediately with the use of appropriate quality assurance tools. *Id.*

PennEngineering's fastener quality management system is ISO9001 registered, Department of Defense QSLM approved, and can support DFARS clause 252.225-7014 requirements. Attarian decl. ¶18.  In addition, PennEngineering's Galway, Ireland, and Kunshan, China facilities are registered to Technical Specification ISO/TS 16949. *Id.* A current list of PennEngineering's quality approvals and certifications is set forth below:

---

[1] PennEngineering assigns all of its patent and trademark rights to a holding company, PEM Management, Inc., and is granted back an exclusive license under the patents and trademarks.

**ISO 9001**
- PennEngineering, Danboro, PA - 20 April 2016
- PennEngineering, Winston-Salem, NC - 7 February 2018
- PennEngineering Singapore Pte Ltd. - 13 January 2016
- PEM Shanghai Co., Ltd. - 30 November 2017

**AS 9100**
- PennEngineering, Danboro, PA - 20 April 2016
- PennEngineering, Winston-Salem, NC - 7 February 2018
- PEM (China) Co., LTD. - 2 October 2016

**Department of Defense**
- QSLM Approval - Class 2 and Class 3 Fasteners, Danboro, PA - 2 May 2016
- QSLM Approval - Class 2 and Class 3 Fasteners, Winston-Salem, NC - 8 February 2018

**ISO 14001**
- PennEngineering Automotive Fasteners, Kunshan facility - 15 July 2018
- PEM China, Kunshan facility (English) - 28 October 2017
- PEM China, Kunshan facility (Chinese) - 20 November 2016

**ISO/TS 16949**
- PEM Europe, Galway, Ireland – 27 May 2018
- PennEngineering Automotive Fasteners, Kunshan facility – 30 June 2018
- PEM China, Kunshan facility (English) - 20 November 2016
- PEM China, Kunshan facility (Chinese) - 20 November 2016

**A2LA Certification**
- PEM (China) Co., LTD. - 31 January 2017

**Nadcap Accreditation**
- PEM (China) Col, LTD. – 30 April 2017

Attarian decl. ¶ 18.

PennEngineering is a member of the Automotive Industry Action Group (AIAG), which

is a group of companies that work together to resolve issues critical to the automotive supply

chain. Attarian decl. ¶19.  PennEngineering is also a registered member of the International

Material Data System (IMDS). *Id.*  The majority of PennEngineering's part numbers are

compliant with the current revision of the European RoHS directive (2002/95/EU). *Id.* at ¶20.

PennEngineering is committed to helping its customers select RoHS compliant products and

offer this general statement regarding compliance of its fasteners to the RoHS directive. *Id.*  If compliance certification on specific part numbers is needed, PennEngineering also supplies such certification if a list of PennEngineering's part numbers is supplied. *Id.*  PennEngineering continues to work towards improving its product compliant status. *Id.*  These numerous quality approvals and certifications underscore PennEngineering's reputation for manufacturing the highest quality products.

> **D.**     **PennEngineering's Famous PEM Family of Marks**

Since at least as early as 1946, PennEngineering has used the trademark PEM in commerce to advertise, promote and sell its fastener products and accessories, and to identify and distinguish its goods from the goods of other companies. Attarian decl. ¶22.  Sample advertisements showing use of the mark PEM from the 1960's are attached hereto as exhibit 3. *Id.*

On June 19, 1962, PennEngineering was awarded U.S. Registration No. 732,947 ("the '947 Registration"), which grants PennEngineering the exclusive right to use the mark PEM, or any confusingly similar mark (colorable imitation), in connection with "drill bushings and self-clinching nuts, fasteners, studs and stand-offs", and in connection with related goods.  A true and correct copy of the '947 Registration is shown in exhibit 4.  The mark PEM was registered on the Principal Register without the need to claim secondary meaning. Exh. 4.  The '947 Registration became incontestable under the Lanham Act on October 25, 1984 when the U.S. Patent & Trademark Office accepted and acknowledged PennEngineering's Section 15 Affidavit.  For the past 69 years, PennEngineering has continuously used and heavily promoted and advertised the mark PEM in numerous industries including: aerospace/aircraft; appliances; automobiles; compact electronics; consumer electronics; food service equipment; furniture/fixtures/signs;

industrial equipment; lawn/garden equipment; lighting; marine/boating; medical; military;

recreational; telecom; trucks/trailers. Attarian decl. ¶24.

Over the years, PennEngineering has adopted numerous additional marks for its fastener

products that incorporate the mark PEM.  For example, PennEngineering advertises, promotes

and sells its fastener products using the following federally-registered marks:

| **Mark** | **Registration Number** | **Registration Date** | **Incontestability Date** | **Goods & Services** |
|---|---|---|---|---|
| PEM | 732,947 | 6/19/1962 | 10/25/1984 | Drill bushings and self-clinching nuts, fasteners, studs and stand-offs |
| PEM | 1,177,822 | 11/17/1981 | 8/3/1987 | Broaching-type captive fasteners-namely, broaching-type captive fasteners with internal threads, broaching-type captive standoffs with and without internal threads, broaching-type captive solder terminals, broaching-type captive studs, broaching-type captive panel fasteners and metallic inserts. |
| PEM | 1,403,759 | 8/5/1986 | 8/12/1991 | Metal fasteners |
| PEM | 2,758,505 | 9/2/2003 | 9/2/2009 | Panel fasteners, namely self-clinching, snap-in floating and hybrid panel fasteners |
| PEM▽ | 889,244 | 4/14/1970 | 4/14/2010 | Self-clinching fasteners, self-locating weld fasteners, and self-clinching drill bushings |
| PEM▽ | 1,043,967 | 7/20/1976 | 11/9/1981 | Presses for installing fasteners or the like and also for parts of said presses |
| PEM▽ | 1,092,108 | 7/25/1983 | 5/30/2015 | Panel fastener assemblies and spring loaded plunger assemblies |

9

| | | | | |
|---|---|---|---|---|
| **PEM**▽ | 1,113,034 | 2/13/1979 | 4/23/1984 | Electrical terminals and electrical grounding stand-offs |
| **PEM**▽ | 4,331,371 | 5/7/2013 | n/a | Fasteners made of metal, namely, nuts, weld nuts, studs, pins, standoffs, rivets and inserts, cable-tie mounts and hooks for sheet metal; self-clinching panel fasteners made of metal or mostly of metal; panel fasteners and panel fastener assemblies made of metal or mostly of metal; sheet-metal fasteners made of metal; fasteners made of metal or mostly of metal for mounting into printed circuit boards; micro fasteners made of metal for use in the consumer electronics industry |
| PEMFLEX | 937,397 | 7/11/1972 | 7/11/2012 | Fasteners, i.e., nuts |
| PEMHEX | 781,236 | 12/8/1964 | 12/8/2004 | Fasteners |
| PEMSERT | 883,650 | 1/6/1970 | 1/6/2010 | Inserts |
| PEMSERTER | 1,365,248 | 10/15/1985 | 6/3/1991 | Power-operated presses for installing fastener |
| PEMSERTER MICRO-MATE | 1,433,571 | 3/24/1987 | 7/2/1992 | Non-powered hand presses for punching holes and installing fasteners for use in sheet metal |
| PEMSERTER and triangle composite | 3,567,528 | 1/27/2009 | 2/9/2015 | Power-operated presses for installing fasteners |
| PEM SP | 3,270,807 | 7/31/2007 | 8/5/2013 | Metal fasteners |
| PEM300 | 1,444,862 | 6/30/1987 | 10/20/1992 | Sheet Metal Fasteners |

| AUTOPEM | 4,296,186 | 2/26/2013 | n/a | Metal fasteners, namely, nuts, bolts, screws, rivets, standoffs, clinching fasteners; metal threaded fasteners |
|---|---|---|---|---|
| MICROPEM | 4,250,883 | 11/27/2012 | n/a | Metal fasteners, namely, nuts, bolts, screws, rivets, standoffs, clinching fasteners; metal threaded fasteners |
| AEROPEM | 4,298,838 | 3/5/2013 | n/a | Metal fasteners, namely, nuts, bolts, screws, rivets, standoffs, clinching fasteners; metal threaded fasteners |

True and correct copies of the above-listed Registration Certificates are attached as exhibit 4.

PennEngineering also advertises, promotes and sells its fastener products using several common law trademarks for which federal registration is pending. Attarian decl. ¶26.  For example, PennEngineering owns federal trademark applications for the marks PEM SH, PEM SH and design, PEM VM and PEM SMPP. *Id.*  All of PennEngineering's registered and common law trademarks identified above, including the mark PEM, are collectively referred to as the "PEM Family of Marks."

**E.    PennEngineering's Additional Famous Trademarks**

In addition to the PEM Family of Marks, PennEngineering owns more than 100 other federally-registered and common law marks. Attarian decl. ¶ 32.  For example, PennEngineering owns the following trademarks that are being infringed:

| Mark | Registration Number | Registration Date | Incontestability Date | Goods & Services |
|---|---|---|---|---|
| The "Blue Locking Element Mark" | 1,449,260 | 7/28/1987 | 10/30/1992 | Self-clinching locking nuts |

11

| The "Shoulder Flare Mark" | 4,037,181 | 10/11/2011 | n/a | Metal threaded fasteners, namely, panel fasteners with heads of metal and panel fasteners with heads of metal and plastic |
| The "Pedestal Mark" | 4,293,597 | 2/19/2013 | n/a | Metal fasteners, namely, clinch fastener for mounting two sheets or panels in perpendicular orientation |
| SNAPTOP | 1,418,142 | 11/25/1986 | 4/2/1992 | Metal fasteners used to separate and hold printed circuit boards |
| SPOTFAST | 3,341,727 | 11/20/2007 | 9/30/2013 | Metal fasteners, namely, a clinch-attached stud for joining two metal sheets |
| REELFAST | 3,002,446 | 9/27/2005 | 11/8/2011 | Metal fasteners supplied on tape reels for surface mounting to circuit boards |

True and correct copies of the above-listed Registration Certificates are shown in exhibit 4. The six trademarks listed immediately above are hereinafter referred to as PennEngineering's "Six Other Marks." Attarian decl. ¶28. Since their adoption, PennEngineering has continuously used and heavily promoted each of the Six Other Infringing Marks in the same industries as identified above with respect to the PEM Family of Marks. *Id.*

### F.    Advertising, Marketing and Promotion of PennEngineering's Marks

Through substantial marketing and advertising efforts, the PEM Family of Marks and Six Other Marks have become famous in the United States, and recognized throughout the world as trademarks of PennEngineering. The PEM Family of Marks and Six Other Marks, and the extensive recognition and goodwill symbolized by such marks, are extremely valuable assets of PennEngineering. Attarian decl. ¶29. The PEM Family of Marks and Six Other Marks represent PennEngineering's reputation as a producer of top quality fastener products and fastener

installation equipment. *Id.* Today, nearly all of PennEngineering's sales relate to fastener products and fastener installation equipment sold under the PEM Family of Marks. *Id.*

PennEngineering's fastener products and fastener installation equipment bearing the PEM Family of Marks and Six Other Marks are sold throughout the entire world through an extensive network of distributors in the U.S. and dozens of foreign countries. Attarian decl. ¶30. PennEngineering currently has approximately 64 distributors in 47 countries. *Id.* A true and correct list of PennEngineering's current distributors is attached hereto as exhibit 13. *Id.*

PennEngineering's fastener products and fastener installation equipment bearing the PEM Family of Marks and Six Other Marks are also advertised, promoted and sold on its extensive interactive website. Attarian decl. ¶31. True and correct sample pages from PennEngineering's website, *www.pemnet.com*, are shown in exhibit 5. *Id.* PennEngineering has operated this website, and promoted the PEM Family of Marks and Six Other Marks on this website, since at least as early as 1996. *Id.* True and correct sample screenshots from *www.pemnet.com* from 1996, 1999, 2000, 2002, 2005, and 2007 are attached hereto as exhibit 6. *Id.*

PennEngineering's fastener products and fastener installation equipment bearing the PEM Family of Marks and Six Other Marks are also advertised, promoted and sold at national and international trade shows including the following: Pacific Design & Manufacturing; FABTECH; Composites Europe; mtex; MIDEST; Fastener Expo; and, Manufacturing Indonesia. Attarian decl. ¶32. A true and correct list of trade shows at which PennEngineering has advertised and promoted products bearing the PEM Family of Marks and Six Other Marks is attached hereto as exhibit 7. *Id.* Photographs of a typical PennEngineering trade show booth are also included in exhibit 7. *Id.*

PennEngineering's fastener products and fastener installation equipment bearing the PEM Family of Marks and Six Other Marks are also advertised, promoted and sold through numerous national and international trade journals including: Design News; Assembly; NASA Tech Briefs; Machine Design; Design World; Electronic Component News; Fabricator; Electronic Products; Thomas Register; Global Spec; Blech; BBR; Elektronik Automotive; Automobil Produktion; Industrie et Technologies; and Ingenieurs de l'Automobile. Attarian decl. ¶33. A list of trade journals and publications in which PennEngineering has advertised and promoted the PEM Family of Marks and Six Other Marks in 2011, 2012, 2013 and 2014 is shown in exhibit 8. *Id.* True and correct samples of PennEngineering's past national trade journal advertisements from 1978 through 2012 for the United States and Europe are attached hereto as exhibit 9. *Id.* at ¶34. True and correct samples of PennEngineering's past national trade journal advertisements from 2013, 2014 and 2105 are attached hereto as exhibits 10, 11, and 12, respectively. *Id.*

Many of PennEngineering's distributors utilize PennEngineering's automated catalog on their website. Attarian decl. ¶35. All authorized distributors are entitled to incorporate the same marketing information on their website that appears on PennEngineering's website by linking the distributor's website to PennEngineering's website. *Id.* This program allows the distributor to be absolutely sure that they always have the most up to date information running on their websites. *Id.* It is one more step to make PennEngineering's customers aware that the only way they can be assured of getting genuine PEM fasteners is to go to a PEM authorized distributor. *Id.* Sample screen shots showing PennEngineering's website linked to a distributor's website are attached hereto as exhibit 14. *Id.*

PennEngineering's fastener products and fastener installation equipment bearing the PEM Family of Marks and Six Other Marks are also advertised, promoted and sold through independent technical representatives and its own direct sales/technical force. Attarian decl. ¶36. In Europe and Asia, PennEngineering's authorized distributors also act as technical representatives who are also supported by PennEngineering's direct representatives. *Id.*

All totaled, PennEngineering currently spends more than $1,200,00 per year advertising and promoting its PEM Family of Marks and Six Other Marks in the United States and throughout the world. Attarian decl. ¶16.  Over the past 10 years, PennEngineering has spent more than $10,000,000 advertising and promoting its PEM Family of Marks and Six Other Marks. *Id.*  Thus, through extensive and continuous advertising and promotion, the PEM Family of Marks and Six Other Marks have become famous and recognized throughout the United States and the world to be the exclusive trademarks of PennEngineering.

### G.   Defendants' Trademark Infringement

Recently, PennEngineering discovered that Defendants are unlawfully using no less than 13 of PennEngineering's trademarks (20 federal registrations) in connection with the sale of the competing fastening products.  Defendants are not affiliated in any way, are not a licensee of, and are not an authorized distributor of PennEngineering.  Defendants are not a reseller of genuine PennEngineering products.  Defendants have no other authorization, express or implied, to use PennEngineering's marks.

Defendant Pemco Hardware, Inc. ("Pemco Hardware") is advertising and selling fastener products using the marks PEMCO, PEMCO HARDWARE INC., and PEMCO FASTENING SYSTEMS, which are confusingly similar to PennEngineering's trademark PEM and its PEM Family of Marks. Attarian decl. ¶39.  For example, defendant Pemco Hardware is using the

15

PEMCO Infringing Marks on its Internet website to advertise and promote its fastener products. *Id.* True and correct screenshots of Pemco Hardware's website *www.pemcohardware.com* are shown in exhibit 15. *Id.*

Pemco Hardware, Inc. is also using the mark DONGGUAN CITY FENGGANG PEMCO HARDWARE FACTORY on its U.S. website *www.pemcohardware.com.* Exh. 15. The mark DONGGUAN CITY FENGGANG PEMCO HARDWARE FACTORY is also an active link to an associated Chinese website *www.pemcomfg.com*, which is owned by Dongguan Fenggang Pemco Hardware Factory ("Dongguan Fenggang Pemco"). True and correct screenshots of Dongguan Fenggang Pemco's website are attached hereto as exhibit 16. Attarian decl. ¶40. The homepage of this website www.pemcomfg.com prominently displays the mark PEMCO.

Pemco Hardware is also using the marks PEMKU and SHENZHEN PEMCO FASTENING SYSTEM CO, LTD. on its U.S. website *www.pemcohardware.com*. Exh. 15. The mark PEMKU is also an active link to an associated Chinese website *www.pemku.com,* which is owned by Defendant Shenzhen Pemco Fastening Systems Co., Ltd. ("Shenzhen"). *Id.* True and correct screenshots of Shenzhen's website *www.pemku.com* are attached hereto as exhibit 17. Attarian decl. ¶41. True and correct screenshots of Shenzhen's website *www.pemcofastening.en.china.cn* are attached hereto as exhibit 18. *Id.* It appears that Shenzen is the parent company of Dongguan Fenggang Pemco and Pemco Hardware or related in some manner. For example, photos on Shenzhen's website *www.pemku.com* showing numerous boxes stamped with the mark PEMCO are attached hereto as exhibit 18. *Id.* The marks PEMCO, PEMCO HARDWARE INC., PEMCO FASTENING SYSTEMS, DONGGUAN CITY FENGGANG PEMCO HARDWARE FACTORY, PEMKU and SHENZHEN PEMCO FASTENING SYSTEM CO, LTD. are collectively referred to as the "PEMCO Infringing

16

Marks."

Recently, PennEngineering discovered that defendant Pemco Hardware is also advertising and selling fastener products using PennEngineering's Shoulder Flare Mark, Blue Locking Insert Mark, Pedestal Mark, and the marks SPOTFAST, SNAP-TOP and REELFAST (the "Six Other Infringing Marks"). Attarian decl. ¶42.  For example, defendant Pemco Hardware is using the Six Other Infringing Marks on its Internet website to advertise and promote their fastener products. *Id.*  True and correct screenshots of selected pages of Defendants' website *www.pemcohardware.com* showing the Six Infringing Marks are shown in exhibits 19-23 and 29. *Id.*  Together, the PEMCO Infringing Marks and the Six Other Infringing Marks are referred to simply as the Infringing Marks.

PennEngineering and Defendants are direct competitors in the fastener industry. Attarian decl. ¶43.  For example, PennEngineering and Defendants manufacture and sell many of the same types of fasteners. *Id.*  True and correct screenshots of the "products" page of Pemco Hardware's website are shown in exhibit 15. *Id.*  By comparison to the fastener products offered by PennEngineering as described above, Pemco Hardware also sells self-clinching nuts, self-clinching standoffs, pins and bushes, inserts for plastic, self-clinching studs, panel fastener assemblies, spring-loaded plungers, and rivet nuts. *Id.*

Both PennEngineering and Defendants have Internet websites on which their respective goods are advertised and promoted. Attarian decl. ¶44.  These websites are examined by the same industrial customers. *Id.*

### H.      Defendants' Patent Infringement

PennEngineering also recently discovered that Defendants are selling fastener products that infringe five (5) of its U.S. patents. Attarian decl. ¶45.  The following chart identifies PennEngineering's patent and the Defendants' corresponding infringing product:

| Patent No. | Pemco Hardware Infringing Product Name | Exhibit |
|:---:|:---:|:---:|
| 7,374,381 | Type SF Spotfast Fasteners | 25 |
| 8,297,899 | Type T microPEM Tackpin Fasteners | 26 |
| D461,705 | Type TDO Self Clinching Cable Tie Hooks | 27 |
| 5,810,501 | RAA Aluminum Self-Taping Right Angle Fastener | 28 |
| 7,213,321 | Reelfast SMT Fastener | 29 |

Attarian decl. ¶ 45.  Each of the above-listed patents was duly issued by the U.S. Patent Office and is active and in force.  PennEngineering spends more than $350,000 per year to prosecute and maintain all of the patents and trademarks in its intellectual property portfolio. *Id.* at ¶47.

As described in greater detail below, each of the above-identified products is a clear "knock-off" of a PennEngineering's patented fastener. Attarian decl. ¶48-53.  Each of PennEngineering's fastener products that are covered by the claims of the above-listed patents is marked with its respective patent number and provides notice to third parties that the respective fastener products are the exclusive property of PennEngineering. Attarian decl. ¶47.

### III.    THE LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF IN TRADEMARK CASES

Injunctive relief for trademark infringement is expressly authorized under Section 34 of the Lanham Act, which empowers the District Court to grant injunctive relief to prevent a violation of any right of the owner of a mark registered in the United States Patent and Trademark Office, or to prevent a violation of subsections (a), (c), or (d) of section 43 of the

Lanham Act. 15 U.S.C. §1116.  The district court must consider the following four factors when ruling on a motion for a preliminary injunction: (1) the likelihood that the movant will prevail on the merits at final hearing; (2) the extent to which movant is being irreparably harmed by the conduct complained of; (3) the extent to which to non-moving party will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.  *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3rd Cir. 2014); *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 374 (3d Cir. 1992); *Opticians Assoc. of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 191-92 (3d Cir. 1990).  PennEngineering need only establish a "reasonable probability" of prevailing on any underlying claim in order to obtain injunctive relief.  *Opticians,* 920 F.2d at 192.

A.   **PennEngineering Is Likely To Succeed On The Merits of Its Counts For Federal Statutory Trademark Infringement, False Designation of Origin, and Common Law Trademark Infringement**

PennEngineering has pleaded separate counts for trademark infringement under Section 32 of the Lanham Act, false designation of origin under Section 43(a) of the Lanham Act, and common law trademark infringement.  In the Third Circuit, the standards for proving liability under either count are essentially the same.[2]  See *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000); *First American Marketing Corp. v. Canella,* 2004 WL 250537, *2-3 (E.D. Pa. 2004); *Scott Fetzer Co. v. Gehring*, 288 F. Supp. 2d 696, 703 (E.D. Pa. 2003).  In order for PennEngineering to prevail on its count for trademark infringement under Section 32 of the Lanham Act, or false designation of origin under Section 43(a) of the Lanham Act, or for common law trademark infringement for any mark, PennEngineering must prove by a reasonable probability that: (1) PennEngineering's mark is valid and legally protectable; (2)

---

[2] Under Pennsylvania common law, the goods need not have traveled in interstate commerce.  *The Gideons Int'l, Inc. v. Gideon 300 Ministries, Inc., 94 F. Supp. 2d 566, 580 (E.D. Pa. 1999).*

PennEngineering owns rights in the mark; and (3) Defendants' use of the infringing mark to identify its fastener products is likely to cause confusion concerning the source, sponsorship, or affiliation of those goods. See *Id.*; *Opticians,* 920 F.2d at 192; *Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc.*, 669 F. Supp. 1297, 1317 (E.D. Pa. 1987).

> **1.     PennEngineering's Incontestable Registrations Are Prima Facie Evidence of PennEngineering's Ownership and Exclusive Right to Use the Marks in Connection With Fastener Products.**

The first two requirements, ownership and validity, are proven where a mark is federally registered and has become incontestable under the Lanham Act. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3rd Cir. 1994). PennEngineering owns the following incontestable U.S. federal trademark registrations:

| **Mark** | **Reg. Number** | **Reg. Date** | **Incontestability Date** |
|---|---|---|---|
| PEM | 732,947 | 6/19/1962 | 10/25/1984 |
| PEM | 1,177,822 | 11/17/1981 | 8/3/1987 |
| PEM | 1,403,759 | 8/5/1986 | 8/12/1991 |
| PEM | 2,758,505 | 9/2/2003 | 9/2/2009 |
| PEM ▽ | 889,244 | 4/14/1970 | 4/14/2010 |
| PEM ▽ | 1,043,967 | 7/20/1976 | 11/9/1981 |
| PEM ▽ | 1,092,108 | 7/25/1983 | 5/30/2015 |
| PEM ▽ | 1,113,034 | 2/13/1979 | 4/23/1984 |
| PEMHEX | 781,236 | 12/8/1964 | 12/8/2004 |
| PEMFLEX | 937,397 | 7/11/1972 | 7/11/2012 |
| PEMSERT | 883,650 | 1/6/1970 | 1/6/2010 |
| PEMSERTER | 1,365,248 | 10/15/1985 | 6/3/1991 |
| PEMSERTER MICRO-MATE | 1,433,571 | 3/24/1987 | 7/2/1992 |
| PEMSERTER and triangle composite | 3,567,528 | 1/27/2009 | 2/9/2015 |

| PEM SP | 3,270,807 | 7/31/2007 | 8/5/2013 |
|---|---|---|---|
| PEM300 | 1,444,862 | 6/30/1987 | 10/20/1992 |
| The "Blue Locking Element Mark" | 1,449,260 | 7/28/1987 | 10/30/1992 |
| SPOTFAST | 3,341,727 | 11/20/2007 | 9/30/2013 |
| SNAPTOP | 1,418,142 | 11/25/1986 | 4/2/1992 |
| REELFAST | 3,002,446 | 9/27/2005 | 11/8/2011 |

Exh. 4.  Under Section 33 of the Lanham Act:

Any registration . . . of a mark registered on the principal register provided by this chapter  and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the *validity* of the registered trademark and of the registration of the mark, of the registrant's *ownership* of the mark, and the registrant's *exclusive right to use* the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations therein . . . .

15 U.S.C. §1115 (a) (emphasis added).

PennEngineering's exclusive right to use each of the above-listed marks is incontestable

pursuant to section 15 of the Lanham Act which recites, in part:

. . . the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable. . . .

15 U.S.C. § 1065.  PennEngineering timely filed Section 15 affidavits of incontestability for each

of the above-listed marks, which were acknowledged and accepted by the U.S.P.T.O. on the

dates indicated in column 4 entitled "Incontestability Date." Ex. 4.  The official U.S.P.T.O.

record of for each registration indicates that all requirements under Section 15 of the Lanham

Act have been met. *Id.*  This Court may take judicial notice of these official public records.

Therefore, PennEngineering's incontestable registrations prove PennEngineering's ownership of

valid exclusive rights in the marks PEM,   , PEMHEX, PEMFLEX, PEMSERT,

PEMSERTER, PEMSERTER MICRO-MATE, PEMSERTER and triangle composite, PEM SP,

PEM 300, the Blue Locking Element Mark, SPOTFAST, SNAPTOP and REELFAST.

> **2.     PennEngineering's Other Registrations Are Prima Facie Evidence of PennEngineering's Ownership and Exclusive Right to Use the Marks in Connection With Fastener Products.**

PennEngineering also owns the following U.S. federal trademark registrations, which are

not yet incontestable but which provide *prima facie* evidence of PennEngineering's ownership

and exclusive right to use the following marks:

| Mark | Reg. Number | Reg. Date | Incontestability Date |
|---|---|---|---|
| AUTOPEM | 4,296,186 | 2/26/2013 | n/a |
| MICROPEM | 4,250,883 | 11/27/2012 | n/a |
| AEROPEM | 4,298,838 | 3/5/2013 | n/a |
| The "Shoulder Flare Mark" | 4,037,181 | 10/11/2011 | n/a |
| The "Pedestal Mark" | 4,293,597 | 2/19/2013 | n/a |

PennEngineering's federal registrations, in combination with the extensive promotion and use of

the marks described *supra*, prove PennEngineering's ownership of valid exclusive rights in the

marks AUTOPEM, MICROPEM and AEROPEM, the Shoulder Flare Mark and the Pedestal

Mark.

> **3.     PennEngineering Has Established Ownership and the Exclusive Right to Use the PEM Family of Marks in Connection With Fastener Products.**

A "family" of trademarks marks is defined as "a group of marks having a recognizable

common characteristic, wherein the marks are comprised and used in such a way that the public

associates not only the individual marks, but the common characteristic of the family, with the trademark owner. *Primepoint, LLC v. PrimePay, Inc.,* 545 F. Supp. 2d 426 (D.N.J. 2008); Trademark Manual of Examining Procedure 1207.01(d)(xi)(July 2015). There must be recognition by the purchasing public that the common characteristic is indicative of a common origin of the good. *Primepoint, LLC,* 545 F. Supp. 2d at 432. The existence of a family of marks is an issue of fact based on the common formative component's distinctiveness, the family's use, advertising, promotion, and inclusion in party's other marks. *Id* at 433; (quoting *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F. 2d 1460, 1463 (Fed. Cir. 1991). Recognition of the family is achieved when the pattern of usage of the common formative component is sufficient to be indicative of the source of goods. *J & J Snack Foods Corp,* 932 F. 2d at 1463.

A family of marks can be established where there is evidence that the trademarks within the family are advertised together and printed publications showed that the public regards the marks as being part of the family. *Id* at 1463. In order to establish a "family of marks", it must be demonstrated by the Plaintiff that the marks asserted to comprise the family or a number of them have been used and advertised in promotional material or used in daily sale activities in such a manner as to create a common exposure and thereafter recognition by the purchasing public of common ownership based upon the common formative component. *American Standard Inc. v. Scott & Fetzer Co.*, 200 U.S.P.Q. 457, 461 (T.T.A.B. 1978). The proponent of a family of marks must prove that such use and advertisement occurred prior to use of the alleged infringing mark, all or a substantial amount of the marks in the alleged family were used and promoted together in such a manner as to create public perception of the family surname as the origin, and that the family surname is distinctive. *Marion Labs. v. Biochemicals/Diagnostics*, 6 U.S.P.Q.2d 1215, 1218-19 (T.T.A.B. 1988).

23

As described *supra* section II(F), PennEngineering has extensively advertised in promotional material and sale activities the PEM Family of Marks.  These sales and promotional activities all took place long before Defendants' initiated use of the PEMCO Infringing Marks. As a result, the purchasing public now recognizes PennEngineering as the owner of fastener products bearing the common "surname" or formative component[3] "pem".  PennEngineering's four (4) federal registrations for the mark PEM and each of the marks of the PEM Family of Marks prove that the formative component "pem" is distinctive of fastener products. Exh. 4. This combination of federal registrations and extensive promotion and use of the marks prove PennEngineering's ownership of valid exclusive rights in the PEM Family of Marks.

Having proven ownership of exclusive rights in the mark PEM and other marks incorporating the mark PEM, PennEngineering must only prove that a likelihood of confusion results from Defendants' use of the Infringing Marks to prevail on its counts under the Lanham Act and at common law.

### 4. Defendants' Use of the PEMCO Infringing Marks Creates Confusion as to the Source or Sponsorship of Its Fastening Products

A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.  *A&H Sportswear*, 237 F.3d at 211 (internal quotations and citations omitted).  The language of the Lanham Act is broad enough to cover "the use of trademarks which are likely to cause confusion, mistake, or deception of any kind, not merely purchasers nor simply as to source of origin."  *Kos*, 369 F.3d at 711.  (emphasis in original).

---

[3] The term "formative component" is often used interchangeably with the term "surname" regardless of whether the formative component is a prefix, suffix or other common portion of each mark within the family.

In the Third Circuit, the non-exclusive list of factors (commonly referred to as the *Lapp*[4]

factors) that may be considered during a likelihood of confusion analysis for both competing and

non-competing goods includes the following:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark; (3) the price of the goods and other factors
> indicative of the care and attention expected of consumers when making a purchase; (4)
> the length of time the defendant has used the mark without evidence of actual confusion
> arising (5) the intent of the defendant in adopting the mark; (6) evidence of actual
> confusion (7) whether the goods, though not competing, are marketed through the same
> channels of trade and advertised through the same media (8) the extent to which the
> targets of the parties' sales efforts are the same; (9) the relationship of the goods in the
> minds of consumers because of the similarity of function; (10) other facts suggesting that
> the consuming public might expect the prior owner to manufacture a product in the
> Defendants' market, or that he is likely to expand into that market.

*A&H Sportswear*, 237 F.3d at 213; *Interpace v. Lapp*, 721 F.2d at 460, 463 (3d Cir. 1983).  Any

doubts as to whether a likelihood of confusion exists must be resolved in favor of the senior user.

*Blumenfeld*, 669 F. Supp. at 1320.

### a.        Factor 1- Similarity of Marks

The single most important factor in determining likelihood of confusion is similarity of

the mark.  *A&H Sportswear*, 237 F.3d at 216.  The proper legal test for comparing marks is

whether the marks "viewed in their entirety" are confusingly similar.  *Kos*, 369 F.3d at 713

(emphasis in original).  "Marks are confusingly similar if ordinary consumers would likely

conclude that the two products share a common source, affiliation, connection, or sponsorship."

*A&H Sportswear*, 237 F.3d at 216.  When determining whether a likelihood of confusion exists,

the similarity of the respective marks in appearance, sound and meaning should be considered.

*Horizon Financial, FA. v. Horizon Bancorp*, 2 U.S.P.Q. 2d 1696, 1702 (E.D. Pa. 1987);

*Blumenfeld*, 669 F. Supp. at 1320.  If the overall impression created by the respective marks is

essentially the same, the marks are probably confusingly similar.  *Opticians*, 920 F.2d at 195.

---

[4] *Interpace v. Lapp*, 721 F.2d 460, 462 (3d Cir. 1983)

The likelihood of confusion test is also used by courts to determine whether a defendant's mark infringes on Plaintiff's family of marks.  *See Chips'n Twigs, Inc. v. Chip-Chip, Ltd.,* 414 F. Supp 1003, 1013 (E.D. Pa. 1976).  The proper inquiry is whether an ordinary buyer may be likely to think that the alleged infringing mark must come from the family of marks.  *Id at* 1014.

The following chart illustrates how Defendants are using identical, counterfeit and colorable imitations PennEngineering's marks:

| PennEngineering's Registered Mark | Registration Number(s) | Defendants' Infringing Mark(s) |
|---|---|---|
| PEM<br><br>PEM Family of Marks | 732,947<br>1,177,822<br>1,403,759<br>2,758,505<br>781,236<br>883,650<br>889,244<br>1,043,967<br>1,092,108<br>1,113,034<br>4,331,371<br>937,397<br>1,365,248<br>1,433,571<br>1,444,862<br>3,270,807<br>3,567,528<br>4,296,186<br>4,250,883<br>4,298,838 | PEMCO – Exhibit 15<br>PEMCO HARDWARE, INC – Exhibit 15<br>PEMCO FASTENING SYSTEMS – Exhibit 15<br>PEMKU – Exhibit 16<br>www.pemcohardware.com – Exhibit 15<br>SHENZHEN PEMCO FASTENING SYSTEM CO, LTD. – Exhibit 18<br>DONGGUAN CITY FENGGANG PEMCO HARDWARE FACTORY – Exhibit 16<br>MICROPEM – Exhibit 26 |
| The "Shoulder Flare Mark" | 4,037,181<br><br> | <br><br>Exhibit 19<br>Used on PK11, PK12 panel fastener |

| The "Blue Locking Element Mark" | 1,449,260 |   Exhibit 20  Used on PL and PLC hex nylon-inserted nuts |
|---|---|---|
| The "Pedestal Mark" | 4,293,597 |   Exhibit 21  Used on Type RA and RAS steel threaded right angle fastener |
| SPOTFAST | 3,341,727 | SPOTFAST – Exhibit 22 |
| SNAPTOP | 1,418,142 | SNAP-TOP – Exhibit 23 |
| REELFAST | 3,002,446 | REELFAST – Used on SMT panel fasteners  Exhibit 29 |

**PEM and The PEM Family of Marks**
**vs.**
**PEMCO, PEMCO HARDWARE, INC., PEMCO FASTENING SYSTEMS and PEMKU**

The formative element of the PEM Family of Marks is the letter string "pem", which is identical to the registered mark PEM.  However, for purposes of determining likelihood of confusion, the PEM Family of Marks is entitled to a broader scope of protection than the mark PEM.  The owner of a family of marks may rely upon the family element to assert a likelihood of confusion claim against an infringer, "even though a junior user's mark may not be significantly close to any one member of a senior user's family of marks." *Victoria's Secret Stores Brand Mgmt, Inc. v. Sexy Hair Concepts, LLC,* No. 07-5804, 2009 WL 959775, at *3 (S.D.N.Y. Apr. 8,

2009).  "The proper inquiry for a family of marks is to inquire whether the defendant's mark appropriated the salient feature of the family of marks." *Lettuce Entertain You Enter., Inc.v. Leila Sophia AR, LLC,* 703 F.Supp.2d 777, 785 (N.D. Ill 2010).  If defendant's mark "would likely be viewed as a member of the family of marks," then there may be a likelihood of confusion.  *McCarthy on Trademarks* § 23:61 at 185-86 (4th ed. 2010).  When a family of marks is present, it "may have a synergistic recognition that is greater than the sum of each mark." *Quality Inns Int'l, Inc. v. McDonald's Corp.,* 695 F. Supp. 198, 212 (D. Md. 1988).  Therefore, any similarity between one of the Infringing Marks and the registered mark PEM is subsumed within the infringement analysis of the PEM Family of Marks.

Row 1 of the chart shows that Defendants are using marks that are nearly identical and confusingly similar to the PEM Family of Marks.  For example, Defendants are using the marks PEMCO and PEMKU, which look like and sound like the mark PEM.  The mark PEMCO also creates the same commercial impression since it is not uncommon for companies or corporations to add the suffix "co" to the company's core name to create their trade name. Ex. Tyco (Tyler Company), Texico (The Texas Company).  Consumers unfamiliar with PennEngineering's formal corporate name are likely to believe that PEMCO stands for PEM Company or PEM Co. Consumers are also likely to believe that the mark PEMCO falls within the PEM Family of Marks.

Likewise, changing PEMKCO to PEMKU does little if anything to avoid confusion. The marks still look alike and create the same commercial impression.  Substituting the vowel "U" for "O" barely changes the pronunciation of the respective marks.  Generally, insignificant differences in spelling, such as adding, removing or altering a letter, will not avoid a likelihood of confusion with the family of marks. *See, e.g., Mobil Oil Corp. v. Teagarden*, 190 U.S.P.Q.

560, 565 (T.T.A.B. 1976) (barring MOBILE MUFFLER MAN for automotive services because of Mobil's ownership of the MOBIL family of marks).

Furthermore, Defendants' addition of the descriptive words "hardware" and "inc." in the mark PEMCO HARDWARE, INC., and "fastening systems" to the mark PEMCO FASTENING SYSTEMS does nothing to remedy confusion since the parties' respective goods – fastener products - can be broadly and generically described as hardware items.  The addition of descriptive or generic subject matter to a mark does little if anything to avoid confusion.  *See, id. at* 565 (barring MOBILE MUFFLER MAN for automotive services because of Mobil's ownership of the MOBIL family of marks).

**PEM and The PEM Family of Marks**
**vs.**
**Shenzhen Pemco Fastening System Co, Ltd. and**
**Dongguan City Fenggang Pemco Hardware Factory**

Defendant's use of the mark SHENZHEN PEMCO FASTENING SYSTEM CO, LTD. and DONGGUAN CITY FENGGANG PEMCO HARDWARE FACTORY is also likely to cause confusion with PennEngineering's PEM Family of Marks because Defendants have simply added geographic names "Shenzhen" and "Dongguan City Fenggang" or generic matter "fastening system co., ltd." and "hardware factory" to a mark that is confusingly similar to PennEngineering's PEM Family of Marks.  Shenzhen is a city in Guangdong Province, China situated immediately north of Hong Kong.  Fenggang is a town in Guangdong province, southern China, and is located southeast of Dongguan City and north of Tangxia and Qing Town. "It is a general rule that likelihood of confusion is not avoided between otherwise confusingly similar marks merely by adding or deleting a house mark or matter that is descriptive or suggestive of the named goods or services."  Trademark Manual of Examining Procedure § 1207.01(b)(iii).  It is well known that a large percentage of hardware products, including the fastener products sold

29

by the parties, are manufactured in China.  Therefore, these infringing marks create the

commercial impression that these entities are Chinese manufacturing affiliates or subsidiaries of

PennEngineering.

**PennEngineering's Six Other Marks**
**vs.**
**Defendants Six Other Infringing Marks**

The chart set forth *supra* shows that Defendants' Six Other Infringing Marks are

counterfeits, *i.e.,* identical, to PennEngineering's registered trademarks.  Therefore, no further

analysis under this factor is necessary.

Defendant's infringing marks are being used on fasteners that directly compete with

PennEngineering's fastener products.  PennEngineering and Defendants are direct competitors in

the fastening solutions industry. Attarian decl.¶43.  Both PennEngineering and Defendants offer

their respective goods through the same trade channels and to the same prospective customers.

*Id.* at ¶44.  Under Third Circuit law, "[w]here the owner of the trademark and the infringer deal

in competing goods or services, the court need rarely look beyond the mark itself." *Opticians,*

920 F.2d at 195; *A&H Sportswear*, 237 F.3d at 214; *First American Marketing*, 2004 WL

250537 at *4.  Where the trademark owner and the accused infringer deal in competing goods or

services, the Court need only compare the respective marks themselves to determine whether a

likelihood of confusion exists. *Lapp,* 721 F.2d at 460; *Dominion Bank Shares Corp. v. Devon*

*Holding Company, Inc.,* 690 F. Supp. 338, 346 (E.D. Pa. 1988).

In *A&H Sportswear*, the court discussed application of the full complement of *Lapp*

factors in cases where plaintiff and defendant deal in directly competing goods:

> As explained above, we do not hold that a District Court *must* use the [Lapp]
> factors.  In fact our precedents suggest the opposite.  If products are directly
> competing, and the marks are clearly very similar, *a district judge should feel free*
> *to consider only the similarity of the marks themselves*. . . Moreover, the court

30

> need not apply each and every factor; when goods are directly competing, both precedent and common sense counsel that the similarity of the marks takes on great prominence.

*A&H Sportswear,* 237 F.3d at 214 (emphasis added).  Since the most important *Lapp* factor weighs heavily in favor of PennEngineering, and the parties directly compete, the court may conclude that a likelihood of confusion exists, even without consideration of any additional *Lapp* factors.  However, consideration of the remaining relevant[5] *Lapp* factors buttresses a finding of likelihood of confusion.

> **b.    Factor 2- The Mark PEM and The PEM Family of Marks Are Strong and Entitled to Broad Protection Since They Are Inherently Distinctive**

In the Third Circuit, the strength of the mark is measured by (1) the distinctiveness or conceptual strength of the mark; and (2) the commercial strength or marketplace recognition of the mark.  *A&H Sportswear*, 237 F.3d at 221; *Fisons*, 30 F.3d at 478.  The first prong of the test weighs the inherent features of the mark, while the second prong weighs the factual evidence of marketplace recognition. *Id.*

The marks PEM, the PEM Family of Marks, and the marks SPOTFAST, SNAPTOP and REELFAST are inherently strong and distinctive for several reasons.  For example, each of these marks was registered on the Principal Register without the need to claim acquired distinctiveness or "secondary meaning."[6] Attarian decl. ¶¶25, 27.  As discussed above, the registrations for these marks are incontestable evidence of PennEngineering's exclusive right to use the marks in connection with fastening products. 15 U.S.C. § 1115(a).  Therefore, these marks are inherently distinctive. See 15 U.S.C. § 1065.

---

[5] Lapp factor nos. 7 and 9 are irrelevant because the parties sell the same goods and directly compete with one another.
[6] Marks which are not inherently distinctive may be registered on the Principal Register by claiming "secondary meaning" or "acquired distinctiveness" under Section 2(f) of the Lanham Act.

The Shoulder Flare Mark, Blue Locking Element Mark, and the Pedestal Mark were registered on the Principal Register based on acquired distinctiveness by virtue of, among other things, long-term, exclusive use of the mark in interstate commerce.   By the time each registration had issued, the Shoulder Flare Mark, Blue Locking Element Mark and the Pedestal Mark had been used by PennEngineering in interstate commerce for more than 14, 23 and 14 years, respectively. *See supra* section II(F).

The inherent strength of PennEngineering's marks PEM has been multiplied by virtue of the fact that PennEngineering has adopted and developed a family wherein the same formative component "pem" is the same as the mark PEM.   As described above, PennEngineering has adopted, used and promoted the marks PEM, PEMHEX, PEMSERT, PEMFLEX, PEMSERTER, PEMSERTER MICRO-MATE, PEM 300, PEM SP, PEMSERTER and triangle composite, AUTOPEM, MICROPEM, and AEROPEM. Attarian decl. ¶25.   PennEngineering has been developing and using the PEM Family of Marks for over 69 years. *Id.*   PennEngineering has spent tens of millions of dollars, and currently spends more than $1,200,000/year, advertising and promoting its PEM Family of Marks. Attarian decl. ¶37.   PennEngineering currently has approximately 64 distributors in 47 countries. *Id.* at ¶30.   A detailed description of PennEngineering's extensive promotion of the mark PEM and the PEM Family of Marks on its website, at international trade shows, in international trade journals and publications is set forth *supra* section II(F).   Through extensive and continuous advertising and promotion, the PEM Family of Marks has become very strong and entitled to broad protection because they have a "a synergistic recognition that is greater than the sum of each mark." *Quality Inns Int'l, Inc.* at 212.

c.    **Factor 3- PennEngineering's Fastening Products Are Inexpensive and Purchasers Are Not Likely to Carefully Investigate the Source of Such Goods**

Both PennEngineering and Defendants sell many identical fasteners. Attarian decl. ¶43. PennEngineering's fasteners are well known in the industry and have a reputation as a top-quality product.  Generally, the parties' goods are very inexpensive.  For example, the cost of PennEngineering's fasteners may range from about $0.03 to about $0.90 per unit in volumes of about 250,000, which is very inexpensive compared to the cost of other components of the devices with which such fasteners are used. *Id.* at ¶15.  Because of the low cost of the product and the excellent reputation of PennEngineering's fastener products, consumers may no longer carefully investigate the source of fasteners bearing PennEngineering's marks or colorable imitations thereof.

Even if great care is taken by customers when purchasing fastener products, "it has been held that the care with which consumers select a product does not impact the association they may make regarding sponsorship of another product or service; therefore even a high degree of care would have little effect on confusion of *sponsorship*." *Kos*, 369 F.3d at 717, citing 3A Louis Altman, *Callman on Unfair Competition, Trademarks & Monopolies* § 21:10 & n. 139 (emphasis added).  Even if careful consumers are able to discern the separate identities of PennEngineering and Defendants' fastener products, such consumers are likely to believe that Defendants are somehow sponsored by or affiliated with PennEngineering.

Confusion among unsophisticated consumers must also be considered.  "[W]here both professionals and the general public are relevant consumers, "the standard of care to be exercised . . . will be equal to that of the least sophisticated consumer in the class." *Kos*, 369 F.3d at 716 citing *Checkpoint Systems, Inc. v. Check Point Software Technologies*, 269 F.3d 270, 285 (3d

Cir. 2001).  Fasteners of the type sold by the parties are often purchased by unsophisticated customers who do not expend great care or attention regarding product source. Attarian decl. ¶44.  Therefore, likelihood of confusion must be surveyed from the perspective of the unsophisticated that does not carefully investigate the source of goods. *See Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 297 (3d Cir. 1991).

### d.      Factor 4 - Defendants' Use of the Infringing Marks Began Only Recently

To PennEngineering's knowledge, Defendants' use of the Infringing Marks on their products began only recently.  To PennEngineering's knowledge, Defendants have only recently adopted and incorporated their infringing marks on their websites.  Since Defendants have only used the Infringing Marks for a short period of time, confusion in the marketplace is in its infancy.  However, PennEngineering is already aware of at least one large customer that is now buying infringing product from Defendants. Attarian decl. ¶56.  Now that Defendants have their "foot in the door" with this client, Defendants are likely to procure more business from the client. *Id.*  "But for" supplying the infringing product, Defendants would not likely have gotten purchase orders of any type from this client. *Id.*

### e.      Factor 5 - Defendants Intend to Divert Business from PennEngineering

The Third Circuit has held that evidence of intentional, willful, and admitted adoption of a mark that is closely similar to the senior user's mark weighs strongly in favor of finding a likelihood of confusion. *Kos,* 369 F.3d at 721; *Checkpoint*, 269 F.3d at 286.  The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant.  *Kos*, 369 F.3d at 721; *Fisons*, 30 F.3d at 480.  A junior party's intent will indicate a likelihood of confusion in the

34

marketplace if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior user's mark to resemble the senior user's mark. *A&H Sportswear*, 237 F.3d 225-26 (emphasis added).

Defendants clearly intend to unlawfully divert business from PennEngineering. PennEngineering's federal registrations provide constructive notice to Defendants as a matter of law. Defendants' knowledge of PennEngineering's marks can also be inferred from the fame of such marks, especially the PEM Family of Marks.

Furthermore, the sheer number of Infringing Marks, including those that are identical to PennEngineering's marks, compels a singular conclusion, *i.e.,* that Defendants are doing their best to unlawfully imitate PennEngineering. For example, Defendants have identically copied the Shoulder Flare Mark, the Blue Locking Insert Mark, the Pedestal Mark, and the marks microPEM, SNAPTOP, SPOTFAST and REELFAST.

Additionally, there is no rational, lawful explanation for Defendants' use of the Infringing Marks. None of PennEngineering's marks is descriptive of fastening products or is commonly used in the fastener solutions industry. To the contrary, PennEngineering's Shoulder Flare Mark, Blue Locking Element Mark, and the Pedestal Mark were intentionally designed *at added cost* to distinguish PennEngineering's fastener products from its competitors. Attarian decl. ¶37. In the face of such evidence, defendant cannot plausibly claim to be an innocent infringer. When a company knowingly adopts a mark similar to another's mark, the court should presume intent to deceive the public. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir. 1979).

### f.     Factor 6 - PennEngineering Can Establish Initial Interest Confusion

A plaintiff need not present evidence of actual confusion to establish likelihood of confusion under the Lanham Act. *Checkpoint,* 269 F.3d at 291 ("[e]vidence of actual confusion

is not required to prove likelihood of confusion") (citations omitted).  Although such evidence is

extremely persuasive if it exists, the non-existence of such evidence is not a factor in determining

likelihood of confusion. *Id.*  Since Defendants have only used their infringing marks for a very

short period of time, confusion in the marketplace is in its infancy.

Both PennEngineering and Defendants use the Internet to attract customers. Attarian

decl. ¶44.  Defendants' use of the Infringing Marks creates a likelihood of confusion by

wrongfully diverting customers.  Each time a customer is unlawfully linked to Defendants'

website instead of PennEngineering's website, PennEngineering may lose a customer, even if the

customer eventually discovers Defendants' true identity.  Where a party captures customers

using another's marks, the party may be liable for infringement based on the theory of initial

interest confusion, even where a purchaser knows the source of the goods. *See Checkpoint*, 269

F.3d at 270 (We agree and hold initial interest confusion is actionable under the Lanham Act.)

(citing *3 J. McCarthy on Trademarks and Unfair Competition*, § 23:6.  "[Trademark

infringement] can be based upon confusion that creates initial customer interest, even though no

actual sale is finally completed as a result of the confusion.")

       **g.**     **Factors 7 and 8 - PennEngineering and Defendant Market
Their Goods Through the Same Trade Channels and Target
The Exact Same Customers**

The similarity of the marketing channels of PennEngineering's and Defendants' fastener

products further suggests a likelihood of confusion.  The greater the similarity in advertising and

marketing medium, the greater the likelihood that defendant will cause confusion. *Kos*, 369 F.3d

at 722; *Checkpoint*, 269 F.3d at 288-89.  Further, neither customer sophistication nor the

relationship between the goods is relevant to determining whether the goods are marketed and

advertised through the same media. *Kos*, 369 F.3d at 722.

PennEngineering and Defendants market their respective goods through the same trade channels. Attarian decl. ¶44.  Both parties advertise and promote their respective goods to the same customers. *Id.*  Both parties have Internet websites on which their respective goods are advertised and promoted. *Id.*  Each party's website includes photographs and descriptions of its fastener products.  *See* exhs. 1 and 15.

Additionally, PennEngineering's customers include contract manufacturers (CM's), sheet metal fabricators, original equipment manufacturers (OEM's), design engineers, mechanical engineers, CAD designers, and packaging engineers. Attarian decl. 44.  These are the same customers targeted by Defendants.

> ### h. Non-exclusive Factors Which Lead to the Conclusion That Defendant's Acts Create a Likelihood of Confusion

Defendants are using counterfeits and colorable imitations of PennEngineering's valuable marks, including its PEM Family of Marks, as metatags and/or keywords encoded in the HTML code of their websites.  The unique nature of cyberspace infringement is particularly troublesome.  For example, once a customer is lured to one of Defendants' websites, the site is usually automatically saved in the customer's web browser history where the site can be stored for future use and reference.  Once Defendants successfully divert customers from PennEngineering's website, Defendants are likely to reap repeat business from the customer when the customer "calls-up" the website through which it has purchased fasteners in the past. This scenario, where diverted sales occur even though the consumer is not confused, is actionable in the Third Circuit under the theory of initial interest confusion. See *Checkpoint*, 269 F.3d at 292.

**B.      PennEngineering Will Suffer Irreparable Harm Unless Defendants'
Infringement Is Enjoined**

For a plaintiff to prevail on a motion for a preliminary injunction, it must prove that it

will likely suffer irreparable harm if the defendant's use of the infringing mark(s) is not enjoined.

*eBay Inc. v. MercExchange L.L.C.*, 547 U.S. 388, 393 (2006).  The United States Supreme Court

recently held that a presumption of irreparable harm no longer exists in patent infringement

cases. *Id.*  The Third Circuit has extended this standard to plaintiffs seeking a preliminary

injunction to enjoin trademark infringement. *See Ferring Pharms. Inc.* at 217.  However, the

Third Circuit recently reiterated that a court may find irreparable harm by permissible inference.

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC,* 774 F.3d 192, 205 (3rd Cir. 2014).  "A

critical aspect of fact-finding in [preliminary injunctions] and other contexts is drawing

reasonable inferences from facts in the record. *Id* at 205.  The Third Circuit spelled out factors

that should guide a court in determining whether there is a likelihood of irreparable harm

including the competitive relationship between the parties and products and the testimony of

Plaintiff's marketing director.  *See id.* at 204-05.

Despite the lost presumption, it is still well settled that in actions for trademark

infringement and unfair competition, under common law and under the Lanham Act, the loss of a

plaintiff's control over its reputation and goodwill is an irreparable injury for which preliminary

injunctive relief is appropriate.  *Jiffy Lube*, 968 F.2d at 378; *Opticians*, 920 F.2d at 195.  Lack of

control amounts to irreparable injury "even though the borrower does not tarnish it, or divert any

sales by its use," *Opticians*, 920 F.2d at 195, or even if "the infringer is putting the mark to better

use." *Jiffy Lube*, 968 F.2d at 378.

In the fastener solutions industry, name and reputation are critical to a company's

continued success. Attarian decl. ¶17.  PennEngineering's name and reputation are its most

38

valuable assets. *Id.*  Defendants' use of colorable imitations of PennEngineering's valuable marks usurps PennEngineering's right to control its name and reputation, and threatens to cause irreparable harm to its name and reputation.

Defendants' fastener products may also be inferior to PennEngineering's fastener products, and may not comply with industry standards.  PennEngineering's extensive manufacturing certifications are set forth *supra* section II(C).  On information and belief, Defendants' products are inferior quality to PennEngineering's products, and Defendants' manufacturing process is inferior to PennEngineering's manufacturing process.  However, even if Defendants' goods are not inferior, PennEngineering is entitled to injunctive relief.

> Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the actions of another.  Plaintiff's lack of ability to control the nature and quality of services provided under an infringing service mark, even if defendant matches the high quality of plaintiff's services, constitutes irreparable injury.  Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.

*Opticians*, 920 F.2d at 196.

Irreparable harm may also be inferred from PennEngineering's financial interest in its numerous trademarks as well as the expense that PennEngineering has incurred in promoting its marks. *See Horizon,* 2 U.S.P.Q. 2d at 1704.  Over the past 69 years, PennEngineering has spent millions of dollars advertising and promoting its mark PEM, the PEM Family of Marks and multiple other marks. Attarian decl. ¶37.  PennEngineering is entitled to protect its substantial financial interest in its valuable trademarks.

### C.   The Balancing of Equities Favors Injunctive Relief Where Defendant Is Infringing PennEngineering's Trademark

PennEngineering has established a strong showing of likelihood of success on the merits. The stronger plaintiff's likelihood of success on the merits, the less heavily need the balance of

harms weigh in its favor. *Kos,* 369 F.3d at 729; *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 597 (3d Cir. 2002).  In addition, several salient equitable considerations weigh heavily in PennEngineering's favor.

> **1.     Defendants <u>Intentionally</u> Adopted Marks That Are Confusingly Similar to PennEngineering's Marks**

It is well established that the subsequent user of a mark has a duty to choose a mark or name so as to avoid *all confusion* as to the source or origin of its goods or services. *Blumenfeld,* 669 F. Supp. at 1321 (emphasis added).  In the present case, Defendants have breached this duty by <u>intentionally</u> adopting marks that are identical to, *i.e.,* counterfeits, or confusingly similar to PennEngineering's marks.  This is not a case where Defendants innocently or unknowingly adopted marks similar to PennEngineering's marks. *See U.S. Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 142 (3rd Cir. 1981).  PennEngineering has used the mark PEM and the PEM Family of Marks for over 69 years, and it is well-known world-wide in this industry.  A party cannot claim to be harmed where it has brought any and all difficulties occasioned by the issuance of an injunction upon itself.  *Kos*, 369 F.3d at 728; *Jiffy Lube*, 968 F.2d at 379; *Opticians*, 920 F.2d at 197.  "One entering a field already occupied by another has a duty to select a trademark that will avoid confusion . . . Having adopted a trademark which now causes confusion, defendant cannot now complain that having to mend its ways will be too expensive." *Opticians*, 920 F.2d at 197 (citations omitted).  Courts of the Third Circuit have often recognized that any injury that a defendant might suffer from an injunction may be discounted by the fact that the defendant brought that injury upon itself. *Novartis*, 290 F.3d at 596; *Pappan Enter., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3rd Cir. 1998).

### 2.    PennEngineering Seeks Only Limited Equitable Relief

Despite having demonstrated broad rights in the mark PEM, the PEM Family of Marks and its Six Other Marks, PennEngineering only seeks limited equitable relief.  PennEngineering only seeks to protect the goodwill and reputation of its well known marks.  PennEngineering does not seek to enjoin Defendants from selling all fastener products; rather, PennEngineering merely seeks to enjoin Defendants from using counterfeits and colorable imitations of PennEngineering's valuable trademarks in connection with the sale of fastener products and related products.  Defendants are free to sell fastener products under any other name that does not cause confusion in the marketplace, or dilute PennEngineering's famous marks.  In view of the circumstances set forth above, PennEngineering's Proposed Order fairly balances the interests of both parties.

### 3.    Potential Injury to Defendant Is Subservient to Protection of the Public Interest and the Trademark Rights of PennEngineering

The court should not be overly concerned with the possible injury caused to the defendant.  "Protection of infringers is not a purpose of the Lanham Act.  To the contrary, the Act's objective is the protection of the trademark and the public."  *Jaycees*, 639 F.2d at 142.

An injunction poses little recognizable hardship on Defendants; however, even if the issuance of a preliminary injunction would have a devastating effect on Defendants' business, an injunction should still be granted since an infringer should not be permitted to carry out and continue business activities based on infringing activities. *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1255 (3d Cir. 1983).  Accordingly, the aforementioned equitable considerations tip decidedly in favor of PennEngineering.

41

**D.      Public Interest Favors Issuance Of An Injunction To Enjoin Defendant's Use of the Infringing Marks**

Public interest considerations also weigh heavily in favor of PennEngineering and compel issuance of an injunction.  In a trademark case, the public interest can be defined in a number of ways, but is most often a synonym for the right of the public not to be deceived or confused. *Kos*, 369 F.3d at 730; *Jiffy Lube*, 968 F.2d at 379; *Opticians*, 920 F.2d at 197. "Preventing deception of the public is itself in the public interest." *SK&F, Co. v. Premo Pharmaceutical Lab.*, 625 F.2d 1055, 1067 (3d Cir. 1980).  Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest. *Jiffy Lube*, 968 F.2d at 379; *Opticians*, 920 F.2d at 197.  In this respect, harm to the public interest is much like irreparable injury to the trademark owner. *Jiffy Lube*, 968 F.2d at 379.

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." See *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994).  The policy behind federal and common law trademark infringement is to prevent consumer and customer confusion and protect those entities, which have a valid right to use a specific name or mark. *Horizon,* 2 U.S.P.Q. 2d at 1705.  Thus, overwhelming public policy compels issuance of an injunction, which enjoins Defendants' unlawful use of PennEngineering's trademarks.

**IV.     The Legal Standard for Issuing Injunctions in Patent Cases**

To be awarded a permanent injunction in a patent infringement case, a plaintiff must demonstrate that (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public

42

interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  The same standard applies for preliminary injunctive relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 27 (2008).

Historically, preliminary injunctions have routinely been granted in patent cases because of the special nature of patents. *See e.g., Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975 (Fed. Cir. 1996); *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988); *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1577-78 (Fed. Cir. 1983) ("Without this injunctive power of the courts, the right to exclude granted by the patent would be diminished, and the express purpose of the Constitution and Congress, to promote the progress of the useful arts, would be seriously undermined."), *cert. denied*, 464 U.S. 996 (1983).  Each of the four factors discussed below weighs heavily in favor of enjoining Defendants sale of the Infringing Products.

## V.      ARGUMENT

### A.      PennEngineering Will Likely Succeed on the Merits.

Initially, PennEngineering is required to show that Defendants likely infringe only one claim in the patent.  *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,* 237 F.3d 1359, 1363 (Fed. Cir. 2001).  The first step in determining whether a patent is infringed is for the court to decide the proper scope and meaning of the claims of the patent.  *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1351 (Fed. Cir. 2001).  The court can make a tentative claim construction in the preliminary injunction motion setting.  *Aventis. v. Barr Labs., Inc.*, 411 F.Supp.2d 490, 495 (D. N.J.), *aff'd*, 208 Fed.3d 842 (Fed. Cir. 2006).  In the second step, the product alleged to be infringed is compared to each claim in the patent to determine whether the product contains every limitation recited in a claim or the substantial equivalent of any limitation not literally present.  *Oakley, Inc. v. Sunglasses Hut Inter.*, 316 F.3d 1331, 1339 (Fed. Cir. 2003).

43

The test, however, "does not require that infringement be proven beyond all question, or that there be no evidence supporting the viewpoint of the accused infringer." *Larami Corp. v. Lanard Toys Ltd.*, 1992 WL 13683, at *1 (E.D. Pa. Jan. 24, 1992) (quoting *HH Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384 (Fed. Cir. 1987).

### 1. PennEngineering's Patents Are Presumed Valid And Defendants Will Not Be Able To Present Evidence To Substantially Question Validity

Patents are presumed valid on a motion for preliminary injunction. *See HH Robertson Co.* at 387. This presumption is based on the law that a "grant of a patent is the grant of the right to invoke the state's power in order to exclude others from utilizing the patentee's discovery without his consent." *Smith Int'l*, 718 F.2d at 1577. Each of PennEngineering's patents is legally presumed valid under 35 U.S.C. § 282, which states:

> A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple claims shall be presumed valid even though dependent upon an invalid claim.
> . . .
> The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

35 U.S.C. § 282. This presumption is based in part on the expertise of patent examiners who are presumed to have done their job. *Brooktree Corp. v. Advance Micro Devices, Inc.*, 977 F.2d 1555, 1574, 24 U.S.P.Q.2d 1401, 1414 (Fed. Cir. 1992). The presumption of validity is applicable to every one of the many grounds challenging the validity of a patent, including nonobviousness under Section 103. *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1570 (Fed.Cir. 1987); *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1375 (Fed.Cir. 1986). Each claim of a patent is presumed valid independent of the validity of any other claim.

35 U.S.C. § 282; *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.,* 796 F.2d 443, 446 (Fed.Cir. 1986).

Each of PennEngineering's patents were duly issued by the United States Patent and Trademark Office, and is active and in force. See exhs. 25-29.  The court may take judicial notice of these official federal government records.

Defendants have the burden of showing invalidity. *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002) (internal citations omitted). In order to overcome the presumption of validity, Defendants would have a heavy burden. Defendants must raise a <u>substantial question</u> with respect to the validity of the patent. *See Abbott Labs.*, 473 F.3d at 1201; *Sanofi-Synthelabo v. Apotex*, 470 F.3d 1368, 1374 (Fed. Cir. 2006).

### 2.     PennEngineering Can Demonstrate a Strong Case for Infringement of the '381 Patent

Defendants' products identified as "Type SF and Type SFP SpotFast Fasteners for Joining of Two Metal Sheets" indirectly infringe U.S. Patent No. 7,374,381 (the "381 Patent") under 35 U.S.C. § 271(b) and (c)[7].  Defendants' Type SF and Type SFP fasteners are direct "knock offs" of PennEngineering's patented double flush clinch stud.  A side-by-side comparison of Defendants' infringing product and a drawing of a preferred embodiment of the invention from the '381 Patent is shown in Exhibit 25.

Exhibit 25 also shows the structure of Defendants' infringing fastener that is especially made or especially adapted for use in an infringement of claim 1, which recites:

1.     An assembly, comprising:

---

[7] 35 U.S.C. § 271(b) reads: "Whoever actively induces infringement of a patent shall be liable as an infringer."

35 U.S.C. §271(c) reads: "Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

a fastener joining two metal sheets in face-to-face contact in relationship, comprising:

a shank having a preformed head at one end and a preformed endcap at the opposite end;

the head being a first displacer having a top surface and being the largest diameter of said fastener;

a first undercut groove on said shank, located immediately below said first displacer, said first undercut groove having a first diameter;

a second displacer on said shank, located immediately below said first undercut groove, said second displacer having a second diameter less than said head largest diameter and larger than said 1st diameter;

a second undercut groove on said shank located immediately bellow said second displacer; and

the endcap located immediately below said second undercut groove and being of lesser diameter than said second displacer's second diameter;

a first planar sheet having a first hole therein including sidewalls which occupy substantially all of said first undercut groove of said fastener; and

a second planer sheet joined in face-to-face relation to said first sheet, said second sheet having a second hole therein of lesser diameter than said first hole in said first sheet and being concentric therewith, said second hold being of lesser diameter than said first hole and having sidewalls which occupy substantially all of said second undercut groove of said fastener, said top surface of said fastener is substantially flush with a top surface of said first sheet and an endface of said endcap of said fastener is substantially flush with a bottom surface of said second sheet.

The advertisement in Exhibit 25 shows Defendants' Type SF and Type SFP fasteners connecting two metal sheets and shows how Defendants actively induce customers to connect two metal sheets with Defendants' Type SF and Type SFP fasteners.  Exhibit 25 leaves no doubt that Defendants' Type SF and Type SFP Panel Fasteners indirectly infringe the '381 Patent.

**3.    PennEngineering Can Demonstrate a Strong Case for Infringement of the '899 Patent**

Defendants' product identified as "Type T$^{TM}$ microPEM$^®$ TackPin$^{TM}$ Fasteners" not only directly infringes U.S. Patent No. 8,297,899 ("the '899 Patent") under 35 U.S.C. § 271(a), but is a blatant "knock off" of PennEngineering's patented clinch pin fastener.  A side-by-side

comparison of Defendants' infringing product and a drawing of a preferred embodiment of the invention from the '899 Patent is shown in Exhibit 26.

Exhibit 26 also shows the structure of Defendants' infringing product that satisfies each of the elements of claim 1, which recites:

> 1.      A unitary metal fastener comprising:
> a top most head, said head being the largest diameter of the fastener;
> a shoulder extending axially downward from and located immediately below said head, said shoulder including an annular bottom displacer surface for displacing material into which said fastener is installed;
> a barrel-shaped shank with a longitudinal cross-section having arcuate sides, located immediately below said displacer surface; and
> an undercut located at the juncture of said shank and said shoulder, said undercut being bounded above by said displacer surface and below by an outwardly divergent tapered arcuate surface of a top portion of the shank.

Exhibit 26 leaves no doubt that Defendants' SMT Panel Fastener infringes the '899 Patent.

Defendants' intentional infringement is further evidenced by the fact that Defendants are using two of PennEngineering's trademarks, microPEM® and TackPin$^{TM}$ to advertise the product. Exh. 26.

### 4.      PennEngineering Can Demonstrate a Strong Case for Infringement of the '705 Patent

Defendants' product identified as "Type TDO Self-Clinching Cable-Tie Hook" not only directly infringes U.S. Patent No. D461,705 ("the '705 Patent") under 35 U.S.C. § 271(a), but is a blatant "knock off" of PennEngineering's patented sheet metal cable hook.  A side-by-side comparison of Defendants' infringing product and a patent drawing of a preferred embodiment of the invention from the '705 Patent is shown in Exhibit 27.

Exhibit 27 also shows the structure of Defendants' infringing product that satisfies each of the elements of claim 1, which recites:

The ornamental design for a sheet metal cable hook, as shown and described.

Exhibit 27 leaves no doubt that Defendants' Type TDO Self-Clinching Cable-Tie Hook infringes

the '705 Patent.

### 5.      PennEngineering Can Demonstrate a Strong Case for Infringement of the '501 Patent

Defendants' product identified as "Type RAA – Aluminum Self-Tapping Right Angle

Fastener" not only directly infringes U.S. Patent No. 5,810,501 ("the '501 Patent") under 35

U.S.C. § 271(a), but is also a blatant "knock off" of PennEngineering's patented right angle

fastener.  A side-by-side comparison of Defendants' infringing product and a drawing of a

preferred embodiment of the invention from the '501 Patent is shown in Exhibit 28.

Exhibit 28 also shows the structure of Defendants' infringing product that satisfies each

of the elements of claim 1, which recites:

> 1.      A metal, clinch-type insert, comprising:
>         a rectangular rigid metal base having opposing side edges, each side edge including pair of lands with an undercut groove located between each of said pairs of lands for receiving a cold flow of metal; and,
>         a neck connecting the top of said base to a pair of upwardly extending partially-cylindrical arms forming an open channel and a bore with an axis parallel to said grooves there between, said neck holding said channel away from said base.

Exhibit 28 leaves no doubt that Defendants' Type RAA – Aluminum Self-Tapping Right Angle

Fastener directly infringes the '501 Patent.

### 6.      PennEngineering Can Demonstrate a Strong Case for Infringement of the '321 Patent

Defendants' product identified as "REELFAST® SMT Panel Fastener" not only directly

infringes U.S. Patent No. 7,213,321 ("the '321 Patent") under 35 U.S.C. § 271(a), but is a blatant

"knock off" of PennEngineering's REELFAST® product.  A side-by-side comparison of

Defendants' infringing product and a drawing of a preferred embodiment of the invention from

the '321 Patent is shown in Exhibit 29.  Claim 1 of the '321 Patent recites:

1.      A two-piece panel fastener, comprising:

a generally barrel-shaped retainer including a tap flange along atop edge of its outer surface, an axial through bore, and a base at a bottom thereof,
a circumferential bulge area along the outer surface of the retainer in approximately the middle of the retainer along its length;
two circumferential valley regions of reduced diameter along the outer surface of the retainer, a first valley region located between said top flange and said bulge area, and a second valley region located between the bulge area and the base; and
a screw located within said through-bore and having a threaded shaft and a plastic cap rigidly affixed to a head of the screw, said cap including resiliently deformable means engaging the outer surface of said retainer to captivate said screw within said retainer.

Exhibit 29 also shows the structure of Defendants' infringing product that satisfies each of the elements of claim 1.  This comparison leaves no doubt that Defendants' SMT Panel Fastener infringes the '321 Patent.  In fact, the screenshot of Defendants' website in exhibit 29 shows that the SMT Panel Fastener is "patented." Exh. 29.  However, Defendants neglect to state that the product is patented *by PennEngineering*, not Defendants.  To add insult to injury, exhibit 29 also shows that Defendants are using PennEngineering's registered trademark REELFAST to advertise Defendants' infringing product.

**B.      PennEngineering Will Be Irreparably Harmed By Defendants' Continued Infringement.**

**1.      Irreparable Harm Should Be Presumed Since Both Parties Practice the Patented Technology**

Prior to *eBay*, the Federal Circuit had authorized district courts to apply a presumption of irreparable harm following judgment of infringement and validity to support the issuance of permanent injunctions. *Reebok Int'l Ltd., v. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed.Cir. 1994). "To hold otherwise [to this presumption] would be contrary to the public policy underlying the patent laws." *Smith Int'l*, 718 F.2d at 1581; *see also E. I. du Pont de Nemours & Co. v. Mac*

49

*Dermid, Inc.*, Civ. A. No. 06-3383, 2007 WL 2332161 at *8 (D.N.J. Aug. 13, 2007); *Eisai Co.,*

*Ltd. v. Teva Pharm. USA, Inc.* Civ. A. No 05-5727, 2008 WL 1722098 at *10 (D.N.J. March 28,

2008).  This is because the patent holder's right to exclude is limited to the term of the patent,

which is not suspended during litigation and the "passage of time can work irremediable harm"

that only a preliminary injunction can prevent. *HH Robertson Co.,* 820 F.2d at 384.   "[B]ecause

the principal value of a patent is its statutory right to exclude, the nature of the patent grant

weighs against holding that monetary damages will always suffice to make the patentee whole."

*Polymer Techs., Inc.,* 103 F.3d at 976 quoting *Hybritech Inc.,* 849 F.2d at 1456.

Since *eBay,* the Federal Circuit has "jettisoned the *presumption* of irreparable harm as it

applies to determining the appropriateness of injunctive relief." *Bosch v. Pylon Mfg. Corp.,* 659

F.3d 1142, 1149 (Fed.Cir. 2011).  However, the Federal Circuit has warned infringers that "it

does not follow that courts should entirely ignore the fundamental nature of patents as property

rights granting the owner the right to exclude." *Id.*  "While the patentee's right to exclude alone

cannot justify an injunction, it should not be ignored either." *Id.* citing *Acumed LLC v. Stryker*

*Corp.,* 551 F.3d 1323, 1328 (Fed.Cir.2008).  The *Bosch* court further cautioned against ignoring

the past presumption of irreparable harm where the plaintiff and defendant both practice the

patented technology. *Bosch,* 659 F.3d  at 1150.

Unless an injunction is granted, PennEngineering will suffer irreparable harm.  Without

an injunction, Defendants will, in effect, become a compulsory licensee of PennEngineering,

which would lose its right to exclude others from practicing its invention.  "If monetary relief

were the sole relief afforded … then … infringers could become compulsory licensees for as

long as the litigation lasts." *Atlas Powder Co. v. Ireco Inc*., 773 F.2d 1230, 1233 (Fed. Cir.

1985); *Hybritech*, 849 F.2d at 1457.

      **2.**     **Without Preliminary Injunctive Relief, PennEngineering Will Lose Invaluable Market Share and Business Relationships**

Unless a preliminary injunction issues, Defendants' infringement of the five patents will continue to cause PennEngineering to lose market share, goodwill and its reputation as an industry innovator.  The loss of market share that PennEngineering is suffering is a key consideration in determining whether a plaintiff has suffered irreparable harm. *See Sanofi-Synthelabo,* 470 F.3d at 1383 (recognizing independent basis for determination of irreparable harm based on, *inter alia*, irreversible price erosion and loss of goodwill); *Canon Computer Sys. v. Nu-Kote Int'l., Inc.*, 134 F.3d 1085, 1090 (Fed. Cir. 1998) (affirming finding of irreparable harm based on nature of patented technology and potential loss of market share); *Hybritech, Inc. v. Abbott Labs.*, 4 U.S.P.Q.2d 1001, 1015 (C.D. Cal. 1987) (reasoning that harm was irreparable because patent's value, "insofar as it could help [the patentee] establish a market position, create business relationships, and thereby gain a foothold in the market, may be lost.  The patent might still be there, but the technology might well have bypassed it, or have found alternatives that are not currently available.  In that case [the patentee's] opportunity to establish itself in the market will have been destroyed."), *aff'd*, 849 F.2d 1446 (Fed. Cir. 1988); *see also Tivo, Inc. v. Echostar Communications Corp.*, 446 F.Supp.2d 664, 669-670 (E.D. Tex. 2006).

Unless a preliminary injunction is granted, Defendants' infringement of PennEngineering's five patents will continue to steal from PennEngineering "the advantage of being the pioneer in the field and the market leader." *Norbrook Labs Ltd. v. G.C. Hanford Mfg., Co.*, 126 Fed. Appx. 507, 509 (2d Cir. 2005).   The loss of a reputation of being an innovator in the field is a basis for finding irreparable harm. *Garvey Corp. v. Barry-Wehmiller Design Group, Inc.*, 365 F. Supp. 2d 893 (2005).

The marketing and sale of infringing products by Defendants has harmed and continues to harm the business of PennEngineering. Attarian decl. ¶ 55.  For example, PennEngineering is already aware of at least one large customer that is buying infringing product from Defendants. *Id.*  Now that Defendants have their "foot in the door" with this client, Defendants are likely to procure more business from the client.  But for supplying the infringing product, Defendants would not likely have gotten purchase orders of any type from this client.

Therefore, a preliminary injunction is the only appropriate remedy because money damages would never fully compensate PennEngineering for the type of harm it is suffering due to Defendants' infringement.  As the Federal Circuit has stated, "[c]ompetitors change the marketplace.  Years after infringement has begun, it may be impossible to restore a patentee's . . . exclusive position by an award of damages and a permanent injunction.  Customers may have established relationships with infringers.  The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by legal fiat." *Polymer Tech.*, 103 F.3d at 975-976; *see also Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 2006 WL 3446144 (N.D. Ill. Nov. 29, 2006) (patentee's right to exclude "cannot be compensated through money damages" because "it is impossible to determine the portions of the market the [patentee] would have secured but for the infringer or how much damage was done to the [patentee's] brand recognition or goodwill due to the infringement.").

### 3.    Defendants May Not Be Able to Compensate PennEngineering For Its Lost Profits

Based on its knowledge of the industry and independent investigation, PennEngineering does not believe it will be able to collect any award of damages from Defendants.  Based on its website, Defendant Pemco Hardware appears to be a small, financially-unstable company operating out of a residential townhouse and a single warehouse. Attarian decl. ¶56.  The

company contact phone numbers appear to be personal cell phone numbers of its two managers. Attarian decl. ¶56.  By the time PennEngineering obtains a monetary judgment at trial, Defendant Pemco Hardware will likely have "folded its tent" and be unable to fully compensate PennEngineering for its lost profits. *Id.*

As best understood, Defendant Shenzhen is a Chinese corporation and Defendant Dongguan Fenggang Pemco is a division of Shenzhen or simply a trade name for Shenzhen.  In either case, PennEngineering will not likely be able to collect any monetary judgment against these Chinese companies.

### C.    The Balance Of Hardships Supports Granting PennEngineering's Motion.

The third factor, balance of the hardships, also favors the granting of a preliminary injunction.  In assessing the relative hardships to the parties, the threatened harm to each from an adverse decision is weighed by the likelihood that the decision is wrong.  The Federal Circuit has held that such a weighing requires consideration of: (1) the strength of the showing of likelihood of success; (2) the magnitude of the threatened harm to the patent owner; and (3) the injury to the accused infringer if the preliminary decision is in error.  *See HH Robertson Co.*, 820 F.2d at 390.

As detailed above, PennEngineering is likely to succeed on the merits because Defendants' products are "knockoffs." Exh. 25-29.  Accordingly, it is unlikely that the issuance of a preliminary injunction would be an error.  It is also clear that PennEngineering is being harmed by its lost patent rights, lost market share and lost reputation as an innovator with respect to *five (5) separate inventions*, not just one.

Defendants can only blame themselves for any hardship they caused themselves by infringing PennEngineering's multiple patents. *See Rubbermaid Commercial Prods., Inc. v. Contico Int'l, Inc.* 836 F. Supp. 1247, 1258 (W.D. Va. 1993) (Defendants "knowing entrance

into a risky venture lays much of the harm at its own doorstep").  "One who elects to build a

business on a product found to infringe cannot be heard to complain if an injunction against

continuing infringement destroys the business so elected." *Windsurfing Int'l, Inc. v. AMF, Inc.*,

783 F.2d 995, 1003 n.12 (Fed. Cir. 1986). *See Pfizer, Inc. v. Teva Pharms. USA, Inc.* 429 F.3d

1364, 1382 (Fed. Cir. 2005).   The denial of relief to PennEngineering "would effectively

extinguish the rights of [PennEngineering] under the guise of protecting the investments of the

infringers.  This . . . would not be equitable." *Wayne-Gossard Corp. v. Sondra, Inc.*, 434 F.Supp.

1340, 1363 (D.C. Pa. 1977), *aff'd*, 579 F.2d 41 (3rd Cir. 1978).  PennEngineering seeks only

limited equitable relief.  PennEngineering does not seek to enjoin Defendants completely from

conducting business; rather, PennEngineering only seeks to enjoin Defendants from selling the

Infringing Products.  Defendants offer dozens of staple, non-infringing products.  Even if

Defendants were to claim that a preliminary injunction would put it out of business, such a fact

should not prevent the Court from granting a preliminary injunction.  *Total Containment, Inc. v.

Environ Products, Inc.*, 23 U.S.P.Q.2d 1305, 1305; 1992 U.S. Dist. LEXIS 6788, *9 (E.D. Pa.

1992).  Therefore, the balance of hardships favors PennEngineering.

     **D.**    **The Public Interest Dictates The Issuance Of An Injunction.**

     The public interest prong also favors PennEngineering.  It is well established that "public

policy favors protection of the rights secured by valid patents." *Smith Int'l*, 718 F.2d at 1581.

Such rights encourage innovation and investment based risk, which is the "fundamental purpose

of the patent grant." *Sanofi-Synthlabo*, 470 F.3d at 1383.  Since in this case there is no counter

"critical public interest that would be injured by the grant of the preliminary relief," this prong

favors PennEngineering's motion for preliminary injunction. *Hybritech*, 849 F.2d at 1458.

PennEngineering's efforts and expenditures to develop its fastening solutions benefit the public. The patent system exists to encourage such investment and innovation.

PennEngineering's fastening solutions are used in many diverse industries, including electronics, computer, data/telecom, medical, automotive, marine, aerospace/aircraft, and general manufacturing. PennEngineering's fastening solutions enable much lower production cost and higher performance for many applications, which translates to lower product cost for the public. Thus, protection of PennEngineering's patented technology will provide direct economic benefit to the public.

## VI. CONCLUSION

For the foregoing reasons, PennEngineering respectfully requests that this court GRANT the requested preliminary injunctive relief set forth in the accompanying proposed Order.

Respectfully submitted,

Ryder, Lu, Mazzeo & Konieczny LLC

Date: 11/20/2015

Joseph M. Konieczny, Sr. (Pa. 59,724)
Plymouth Woods Office Center
531 Plymouth Road, Suite 526
Plymouth Meeting, PA 19462
Telephone: 610-940-1962
Facsimile: 610-940-1963
jkonieczny@ryderlu.com

Attorneys for Penn Engineering & Manufacturing Corp.